Drew A. KERIN, Petitioner–Appellant,

v.

BOARD OF EDUCATION, LAMAR SCHOOL DISTRICT NO. RE–2, PROWERS COUNTY, Colorado, Respondent–Appellee.

No. 92CA0148.

Colorado Court of Appeals, Div. V.

March 11, 1993.

As Modified on Denial of Rehearing April 15, 1993.

Certiorari Denied Nov. 1, 1993.

Colorado Educ. Ass'n, Martha R. Houser, Gregory J. Lawler, Sharyn E. Dreyer, Cathy L. Cooper, Aurora, for petitioner-appellant.

Caplan and Earnest, Alexander Halpern, Alan P. Taggart, Boulder, for respondent-appellee.

Opinion by Judge MARQUEZ.

Petitioner, Drew Kerin, seeks review of an order of respondent, Board of Education, Lamar School District No. RE–2, Prowers County, Colorado (Board), dismissing him from his teaching position. We affirm.

On August 28, 1991, Kerin was informed that the school superintendent intended to recommend his dismissal. The recommendation for dismissal, dated September 23, 1991, stated that the grounds for dismissal

were good and just cause and immorality indicating unfitness to teach. Kerin objected and requested a hearing which was held pursuant to the provisions of the Teacher Employment, Compensation, and Dismissal Act of 1990, C.R.S. § 22–63–101, et seq., C.R.S. (1992 Cum.Supp.) (1990 Act). After making extensive findings of fact, the hearing officer concluded that "good and just cause" for dismissal existed and recommended Kerin's dismissal. The Board voted to accept the hearing officer's recommendations, and Kerin was dismissed.

The hearing officer made the following relevant findings of evidentiary fact.

From September 1985, Kerin, a single man, was a fourth grade teacher employed by the district. Apart from the matters which have led to the recommendation for Kerin's dismissal, Kerin has always been considered an asset to his school and to the district.

Beginning in Kerin's first year of teaching in the district, boys in Kerin's class would go to his home to play games, engage in sporting activities, and get help with their homework. Beginning in the spring of 1986, Kerin would have approximately six boys involved in a wrestling program staying at his house on occasional Friday nights with parental permission.

Kerin's principal was aware as early as Kerin's first year of teaching that he had contact with children outside of school. However, the principal did not know that students and other children were spending nights at Kerin's home. In teacher evaluations conducted after the 1985–86 and 1987–88 school years, the principal raised concerns about Kerin's out of school relationships with students. He discussed this matter with Kerin at the end of the 1985–86 school year.

In the fall of 1988, L.V., a ten-year-old boy and student in Kerin's fourth grade class, began visiting Kerin's home, and, by February 1989, he began spending Friday nights at Kerin's home with other boys. The child's time at Kerin's home was spent with the knowledge and permission of his mother. In the year before entering Ke-

rin's class, L.V. was an above-average student. When he started in Kerin's class his attendance was good, and, while he struggled a bit academically, he was adequately prepared for the fourth grade.

The child did not exhibit behavioral problems in Kerin's class. He did not appear unhealthy or undernourished. His mother was at this time an unmarried mother of 5 children who spoke Spanish as a first language, some English, and was illiterate in both English and Spanish. The family was not well off financially.

The child asked to spend Saturday nights with Kerin and, in addition, began spending school evenings with Kerin. Between April 1989 and October 1990, L.V. spent approximately 90% of the nights living at Kerin's home, with the mother's knowledge and consent. By April 1989, Kerin's relationship with the child was an emotionally intense relationship: that of a father to a son.

In the summer of 1989, Kerin taught the fifth and sixth grades in a summer migrant program. Kerin enrolled L.V. in the program even though L.V. did not require remedial education. By the start of the 1989–90 school year, Kerin was making day-to-day decisions about the child's life without consulting his mother. In September 1990, L.V. attended Lamar Middle School where Kerin registered him.

On September 17, 1990, L.V. was ill and unable to attend school, and Kerin stayed home with him. Kerin discussed his request for paid leave with the superintendent, who advised him that some legal documentation of the relationship was required for Kerin to receive paid leave. The superintendent also advised Kerin that members of the district's board were concerned about boys being around Kerin's house.

Kerin consulted with his attorney and concluded that the best option was a power of attorney, a form for which was prepared for the mother's signature. This form provided for temporary custody and control of L.V. for a period of nine months.

Kerin and a friend and business partner presented the power of attorney to the child's mother. She became concerned that she would be giving away custody of her son. But, nevertheless, the mother signed the power of attorney on September 19, 1990.

On September 27, 1990, the child did not return to Kerin's home when expected. Upon checking with the middle school, Kerin learned that L.V.'s mother had taken the child out of school until the following Monday. The child did not return to school or to Kerin's home on that date, and on October 3, Kerin learned from the child's grandmother that the mother had taken L.V. to Mexico, either because of a family illness or for some other reason.

While the mother and L.V. were in Mexico, Kerin initiated a proceeding in the district court to obtain custody of L.V. Kerin did not want to change the existing arrangement, and he recognized the mother's right to remove the child from the school without his approval. By filing the custody petition, he desired to obtain what he termed a veto power over the child's care and custody.

On October 9, 1990, the district court entered an *ex parte* order prohibiting the mother from removing L.V. from Kerin's physical care and custody and further prohibiting her from removing L.V. from the district's schools or from Prowers County.

The child and his mother returned to Lamar on October 12, 1990. On the evening of October 15, 1990, Kerin showed the *ex parte* order to L.V.'s mother and would not allow L.V. to go home with her that night. From that time forward, the child's mother has not wanted L.V. to stay with Kerin and has wanted L.V. to live with her. As of the date of the hearing before the hearing officer, there had not yet been a hearing on the custody matter between the mother and Kerin.

On October 18, 1990, L.V. was temporarily removed from Kerin's home by the Prowers County Department of Social Services, but was returned to Kerin later that night. On November 7, 1990, L.V. was again removed from Kerin's home and placed in foster care pending investigation of alleged sexual abuse by Kerin. The child has not lived with Kerin or with his mother since that time and Kerin was subject to a judicial order to have no contact with L.V.

The child's removal from Kerin's home had a significant emotional impact on Kerin. Kerin was distracted from his work to the extent that his principal recommended placing him on leave.

On November 30, 1990, the superintendent placed Kerin on paid administrative leave pending the social services investigation. The superintendent took this action since the investigation was taking longer than he anticipated and since the matter was having an impact in the classroom.

Meanwhile, the social services department filed dependency and neglect charges against Kerin and the mother. These charges were tried in April and May 1991, and the jury returned a verdict that Kerin had not sexually abused, fondled, or molested the child, or in any other way had inappropriate sexual relationships with L.V.

Until the fall of 1990, Kerin did not notify the district that the child lived with him, rather than with the mother. The district was not aware of the precise nature of the relationship between Kerin and the child until after the child and his mother returned from Mexico in October 1990. After the verdict in the dependency and neglect case, the superintendent thought that the matter had been resolved. The decision was made for Kerin to return to the classroom the following school year, and in June 1991, he received a new contract for the 1991–92 school year.

By mid-June, six parents called and requested that their child be assigned to a different teacher. On the other hand, some parents told the principal they wanted Kerin to teach their children. As a result of these transfers, Kerin's class had 18 students and the other classes had 25 or 26 students for the next school year. The propriety or impropriety of Kerin's conduct

was a matter of some discussion among the faculty at the elementary school.

Between December 1990 and July 1991, Kerin hung signs on the outside of his home mentioning the child's name. Also, he wrote a letter to the Lamar Daily News in July 1991, stating that the petitions opposing his return to the classroom inaccurately presented the facts of the dependency and neglect case and that he should not be kept out of the classroom. In August 1991, Kerin appeared on two Denver radio talk shows that were heard in Lamar.

Thereafter, the proceedings for dismissal at issue here were initiated. In informing Kerin of the dismissal recommendation, the superintendent presented three reasons: misconduct in Kerin's relationship with L.V.; the allegations of inappropriate contact during the 1989 summer migrant program; and Kerin's actions in bringing attention to himself such that parents questioned his fitness to teach. The district's board did not meet until September 23, 1991, to consider this recommendation.

At various times between the dependency and neglect trial and the September 1991 board meeting, members of the community expressed their support or opposition to Kerin in a number of ways. Petitions to the board were submitted both in support of Kerin's return to the classroom and, in July, in opposition to his resumption of teaching duties. Supporters of Kerin picketed the school administration building on his behalf. Kerin's friends wrote letters of support to newspapers. There were also numerous letters to the editor in support of, or critical of, Kerin's relationship with the child, his attempts to regain custody, and his efforts to return to the classroom.

The dependency and neglect trial, Kerin's attempts to gain custody, a sexual abuse investigation by the Colorado Bureau of Investigation, the recommendation for his dismissal, and the action of the Board have all been extensively covered by newspapers in Lamar, Pueblo, and Denver.

The child has subsequently gone through substantial emotional trauma. He has been interviewed regarding sexual abuse allegations, placed into foster homes, and currently resides in a foster home outside of Lamar. He has been removed from normal relationships with his mother, Kerin (whom he sees as his father), and his friends. This child has undergone extensive psychological evaluation, involving multiple trips to a distant community. He is very depressed and upset by his separation from Kerin and is desperate in his fear of losing that relationship. Kerin is determined to pursue custody of the child, despite consequences such as possible loss of employment.

The hearing officer further found that Kerin had set out with the best of intentions to assist L.V., but that, whether intentionally or not, he had proceeded to exploit his position as a teacher to foster a relationship with this child which fulfilled the emotional needs of Kerin as well as the child.

The hearing officer concluded that it was not established that Kerin had abused the legal process to obtain an order granting him custody of the child. Also, he found no inappropriate contact with students at the summer migrant school. He also concluded that Kerin's actions did not amount to immoral conduct.

However, he concluded that the development of Kerin's relationship with L.V., and the consequences which flowed from that relationship, do constitute good and just cause for termination of a teacher. The hearing officer concluded that Kerin's entry into, and fostering of, the relationship with L.V. bears a reasonable relationship to his fitness to discharge his duties, materially and substantially affects his performance, and was detrimental to students and the efficiency of the service. Thus, the hearing officer concluded that good and just cause exists for his dismissal, and so recommended.

## I.

Citing this court's opinion in *Fredrickson v. Denver Public School District No. 1,* 819 P.2d 1068 (Colo.App.1991), Kerin asserts that the hearing officer erred in con-

cluding that the Lamar district established "other good and just cause" for his dismissal. Specifically, he contends that the school district failed to establish that his conduct had a substantial adverse effect on his performance. We reject these contentions.

### A.

Kerin would have us review this matter based largely upon our reweighing the evidence addressed at the hearing. We reject this approach.

The 1990 Act under which this appeal is brought became effective July 1, 1990. Colo.Sess. Laws 1990, ch. 150 at 1132. It replaced the earlier Teacher Employment, Dismissal, and Tenure Act of 1967, § 22–63–101 et seq. (1988 Repl.Vol. 9). Although the events surrounding this case overlap the effective dates of the two acts, the Superintendent did not recommend dismissal until August 28, 1991. Thus, we hold, and the parties agree, that the 1990 Act is controlling.

■ Under the 1990 Act, a teacher may be dismissed for physical or mental disability, incompetency, neglect of duty, immorality, unsatisfactory performance, insubordination, the conviction of a felony or the acceptance of a guilty plea, a plea of nolo contendere, or a deferred sentence for a felony, or other good and just cause. Section 22–63–301, C.R.S. (1992 Cum.Supp.).

The 1990 Act further provides:

The action for review shall be based upon the record before the hearing officer. If the decision of the board to dismiss the teacher was in accordance with the recommendation of the hearing officer, the court of appeals shall review such record to determine whether the action of the board was arbitrary or capricious or was legally impermissible....

Section 22–63–302(10)(c), C.R.S. (1992 Cum. Supp.).

In *Snyder v. Jefferson County School District R–1*, 842 P.2d 624 (Colo.1992), our supreme court addressed certain provisions of the 1990 Act, but ultimately concluded that the 1990 Act was not applicable to the

school board's order in that case. However, our supreme court has construed the provisions of the predecessor act, and although the 1967 Act provided for review in this court by proceedings under the Administrative Procedure Act, as conceded by both parties, the provisions of the two acts relating to the levels of review remain essentially unchanged.

■ Under both versions, the administrative law judge or hearing officer is to take testimony and make a record, then make findings of fact and recommendations. After the hearing, the Board is required to review findings and recommendations and either retain the teacher, dismiss the teacher, or place the teacher on a one-year probation. See §§ 22–63–117(8) & 22–63–117(10), C.R.S. (1988 Repl.Vol. 9) and §§ 22–63–302(8) & 22–63–302(9), C.R.S. (1992 Cum.Supp). Therefore, appellate holdings regarding the old act are instructive in construing the provisions of the new act in cases in which the decision of the Board to dismiss the teacher was in accordance with the recommendation of the hearing officer.

In *Ricci v. Davis*, 627 P.2d 1111, 1117 (Colo.1981), our supreme court discussed the appropriate standard of review in teacher dismissal cases.

[A] school board is *bound* by the findings of evidentiary fact made by the hearing panel if those findings are adequately supported in the record of the panel's proceedings. A board may not usurp the panel's exclusive authority to find evidentiary facts by basing its conclusions of ultimate fact in whole or in part on 'raw' evidence gleaned from its review of the hearing transcript. (emphasis in original)

However, although bound by adequately supported evidentiary findings of the hearing officer, the school board is granted wide latitude in making findings of ultimate fact.

Finding ultimate facts is the exclusive prerogative of elected school boards. Because these boards 'have the responsibility of implementing and carrying out

the educational programs of their respective communities,' ... they must have the case-by-case authority to 'define the limits of such broad general grounds ... as 'incompetency' and 'immorality' in the educational context'....

*Ricci v. Davis, supra,* 627 P.2d at 1118. '[U]ltimate fact' is generally stated in terms of a statutory standard ... Basic or evidentiary facts, on the other hand, are those on which the ultimate finding rests....

*Blair v. Lovett,* 196 Colo. 118, 124, 582 P.2d 668, 672 (1978).

■ We take these authorities to mean that the Board has considerable latitude in making its findings of ultimate fact, so long as these findings are not arbitrary, capricious, or legally impermissible under § 22–63–302(10)(c), C.R.S. (1992 Cum. Supp.).

■ If, as here, the board accepts a hearing officer's recommendation, we conclude that a two-step analysis is appropriate. First, the court should review the record for the sole purpose of determining whether the hearing officer's findings of evidentiary fact are supported by substantial and competent evidence in the record. *See deKoevend v. Board of Education,* 688 P.2d 219 (Colo.1984); *Ricci v. Davis, supra.* Then, if the evidentiary findings are so supported, the court must review the record to determine if the action of the Board was arbitrary, capricious, or was legally impermissible.

The record, for purposes of judicial review of these findings, consists solely of the formal findings of basic or evidentiary facts made by the hearing officer. *Ricci v. Davis, supra; Fredrickson v. Denver Public School District No. 1, supra.*

### B.

Here, the hearing officer made extensive findings of evidentiary fact. While Kerin disputes certain specific findings of the hearing officer, we conclude that those findings are supported by substantial and competent evidence of record.

First he contests the finding that "his relationship with L.V. caused significant and substantial disruption to the district." Kerin also disputes the findings that his conduct "impaired parent confidence in the district's ability to deliver educational services," that he caused "distrust of the district's role in the community," and that he "has divided the school community and the community at large over his status as an employee of the district." However, these findings are supported by Kerin's own testimony that, after L.V. was taken to Mexico by his mother, he began calling L.V.'s friends in order to find out about L.V.'s whereabouts and that, after L.V. was in foster care, Kerin questioned one of his fourth grade students, who is a relative of the foster parents, in order to find out about L.V.'s condition. Kerin concedes that this last action was inappropriate, and he further concedes that it led to a confrontation with the child's parent.

Further, two school secretaries testified that Kerin repeatedly called them, including at least once at home, in order to find what they might know about L.V. One of the secretaries testified that Kerin sounded "desperate." A secretary testified that, at one point, Kerin asked her to get the license number of the car that picked L.V. up from school while he was in foster care.

Kerin concedes evidence of parental class assignment requests and the anti-Kerin petition, but asserts only that it does not constitute substantial evidence. We disagree.

The principal at the school where Kerin taught testified that parents called in and requested a change of teacher. He also testified that parents indicated that they did not want their child in Kerin's class and that they did not want their child to associate with Kerin.

The superintendent of the school district testified that he received letters and phone calls from parents who expressed concern about the situation and did not want their children to be around Kerin.

While Kerin also disputes the finding that as a result of his actions, "a child

entrusted to the school district has undergone extreme emotional trauma," he concedes on appeal that the evidence in the record does indicate that L.V. has undergone emotional trauma, but asserts that the trauma was not caused by his conduct. He attributes the cause to L.V.'s removal from Kerin's home and his placement in foster care. However, the hearing officer also found that the child had no significant academic or behavioral problems. Yet, the relationship with the mother became adversarial and Kerin continued to press his demand for custody. He further found that the relationship was allowed to develop only because of Kerin's position as teacher.

Additionally, Kerin disputes the findings that he "caused tension between the district's administration and its teachers." In this regard, even the former president of the teacher's association, a witness on Kerin's behalf, testified concerning mistrust in the district. Kerin contends that the district's dismissal action caused tensions among teachers. However, the hearing officer also found that the totality of Kerin's conduct has led to insecurity by the teaching staff.

Further, he disputes the findings that he "brought notoriety to the school district regarding the relationship between students and teachers" and that this notoriety "impaired Kerin's ability to function as a teacher." Contrary to Kerin's assertion, we do not read these findings to suggest that the hearing officer found that Kerin's creation of notoriety in itself constitutes good and just cause for dismissal. These findings are only part of several under the discussion relating to the development of Kerin's relationship with L.V. In this regard the hearing officer also found that the publicity was not generated by the District and that the notoriety clearly flowed from Kerin entering into and continuing the relationship with L.V.

Similarly, he contests the findings that a parent-child relationship was "not appropriate," and that "allowing the relationship to develop" in and of itself, is "good and just cause" for dismissal. First, although critical of the testimony provided by the District's expert witness, a clinical social worker, Kerin acknowledges the witness provided contrary testimony. Second, these excerpted findings must be read in the context of many other findings including that the child's relationship with his mother would be disrupted, that even though the relationship with the mother became adversarial, Kerin continued to press his demand for custody, and that the relationship was allowed to develop only because of Kerin's position as a teacher. In discussing where Kerin crossed the line from appropriate teaching to undertaking an inappropriate role, the hearing officer concluded, and we agree, that by the time he sought custody and control of the child, against the wishes of the mother, that line was crossed.

Kerin's contentions thus center around the alleged effect that his relationship with L.V. had on the school district. In sum, he contends that the evidence shows that this relationship did not cause a significant disruption on the activities of the school district and that his conduct did not significantly impair his performance as a teacher. Concededly, there is conflicting evidence in the record, but it is not the role of this court to reweigh that conflicting evidence. *See deKoevend v. Board of Education,* *supra* (the hearing officer alone is empowered to assess credibility, weigh conflicting evidence, and draw factual inferences from the testimony and exhibits introduced by the parties). We thus conclude that there is substantial and competent evidence in the record to support the disputed findings.

### C.

In addition, we cannot say that the Board's order is arbitrary or capricious or legally impermissible.

In acting upon the findings and recommendation of the hearing officer, the Board accepted the recommendation that Kerin be dismissed. The hearing officer found that "good and just cause exists for dismissal" as required by § 22-63-301. The issue here is whether Kerin's actions constitute other good and just cause within the mean-

ing of § 22–63–301 and are, thus, a permissible ground for dismissal.

Good and just cause includes "any cause bearing a reasonable relationship to a teacher's fitness to discharge [his] duties" or "conduct which materially and substantially affects performance." *Fredrickson v. Denver Public School District No. 1, supra* at 1073.

Our supreme court in *Weissman v. Board of Education,* 190 Colo. 414, 547 P.2d 1267 (1976), held that in determining whether a teacher's conduct indicates unfitness to teach, certain matters may properly be considered including age and maturity of the teacher's students, the likelihood that his conduct may have adversely affected students and other teachers, the degree of such adversity, the proximity or remoteness in time of the conduct, the extenuating or aggravating circumstances surrounding the conduct, the likelihood that the conduct may be repeated, the motives underlying it, and the extent to which discipline may have a chilling effect upon either the rights of the teacher involved or other teachers. These factors are not exclusively definitive.

■ The power to dismiss and discipline teachers finds its justification in the state's legitimate interest in protecting the school community from harm, and its exercise can be justified only upon a showing that such harm has occurred or is likely to occur. *Weissman v. Board of Education, supra.*

The precise substantive content of the statutory grounds for dismissal will depend on the facts presented in each particular case. Considerable discretion is left in the Board of Education to define the limits of such broad general grounds. Boards of education have the responsibility of implementing and carrying out the educational programs of their respective communities and must have authority adequate to enable them to discharge that responsibility. *Blair v. Lovett, supra.*

While a school board's exercise of its discretion to define grounds for dismissal is subject to judicial review, a reviewing court may not freely substitute its judgment for a school board's appraisal of the harm inflicted on the school community by particular instances of teacher conduct. *Snyder v. Jefferson County School District R–1, supra.*

■ A school board's application of the standard to a specific instance of teacher conduct will be sustained by a reviewing court if it is warranted in the record and has a reasonable basis in law. *Ricci v. Davis, supra.*

While the Board, in making findings of ultimate fact, is vested with considerable discretion in fixing the precise substantive content of the statutory grounds for dismissal, the statutory scheme contemplates that such ultimate findings must be fully warranted by the hearing officer's findings of evidentiary fact. *Blaine v. Moffat County School District RE No. 1,* 748 P.2d 1280 (Colo.1988); *deKoevend v. Board of Education, supra.*

■ Here, the hearing officer found that Kerin's competence to carry out his teaching duties has not been questioned. Accordingly, we must determine whether Kerin's conduct outside of the classroom constituted other good and just cause. We answer this in the affirmative.

The hearing officer concluded, and the Board apparently agreed, that Kerin's entry into and fostering of the relationship with L.V. bears a reasonable relationship to his fitness to discharge his duties, materially and substantially affects his performance, and was detrimental to students and the efficiency of the service, thus, constituting good and just cause for Kerin's dismissal.

These conclusions were based on the findings set out above concerning Kerin's relationship with the child and notoriety and public disputes that resulted therefrom and that were fostered, at least in part, by Kerin. We conclude that the record supports the hearing officer's determination that Kerin's conduct clouded his professional judgment and that the disruption in the district exists and will continue if Kerin is retained.

In *Hegener v. Board of Education*, 208 Ill.App.3d 701, 153 Ill.Dec. 608, 567 N.E.2d 566 (1991), the teacher developed a close relationship with two students which carried over into a close personal friendship outside of school hours and activities. Eventually, allegations of sexual improprieties, later proven false, arose. The relationship was the subject of considerable tension and gossip in school, and there, as here, there was no written rule prohibiting such a relationship.

In determining what constitutes cause for dismissal, the *Hegener* court said that cause "must bear some relationship to a teacher's ability to perform her job," but that nonetheless, "the School Board has the right, in the first instance, to determine what constitutes cause using the best interests of the school as a "guiding star." *Hegener v. Board of Education, supra,* 208 Ill.App.3d at 725, 153 Ill.Dec. at 624, 567 N.E.2d at 582.

That court further noted that: "As an experienced teacher, plaintiff should have been able to recognize the professional standards which must guide a teacher's conduct without requiring written rules," and that a teacher must be able to "draw the line between conduct which is necessary for proper performance of her educative function and that which is or which degenerates into one which is primarily for her own emotional gratification." *Hegener v. Board of Education, supra,* 208 Ill. App.3d at 730, 153 Ill.Dec. at 627, 567 N.E.2d at 585.

*Hegener* is in accord with other decisions recognizing that conduct outside the classroom which adversely affects a school is subject to discipline. In *Briggs v. Board of Directors,* 282 N.W.2d 740 (Iowa 1979), an administrator was discharged for deficiencies in staff evaluation, program evaluation, and decision making. The court stated that just cause is one which "directly or indirectly significantly and adversely affects what must be the ultimate goal of every school system: high quality education for the district's students. It relates to job performance including leadership and role model effectiveness." *Briggs v. Board of Directors, supra,* at 743.

Here, the evidence is undisputed that Kerin entered into a legal battle with a parent for custody of a student. While Kerin disputes certain findings, those findings are supported by the record and are binding on review. *Ricci v. Davis, supra.* Based upon these considerations, the Board's acceptance of the recommendation of dismissal was appropriate.

II.

Finally, we turn to Kerin's First Amendment claims.

Section 22-63-302, C.R.S. (1992 Cum. Supp.) requires that dismissal not be arbitrary, capricious, or legally impermissible. Dismissing a teacher for engaging in protected speech would be contrary to law and, hence, "legally impermissible." *See Kemp v. State Board of Agriculture,* 803 P.2d 498 (Colo.1990).

In *Kemp,* our supreme court set forth a four-part test. Under that test, first, Kerin must show that his speech touches upon a matter of public concern. Second, if the speech is a matter of public concern, the burden shifts to the district to show that its interests outweigh Kerin's interests as a citizen in commenting upon matters of public concern. Third, if the district shows that the balance is weighed in its favor, it is unnecessary to go further because the district has met its burden of showing that it terminated Kerin for legitimate reasons. If not, Kerin must show that the protected activity was a substantial or motivating factor in the decision to dismiss him. Finally, the district may defeat Kerin's claim if it can show that it would have reached the same decision even in the absence of the protected conduct.

Here, the hearing officer considered the signs Kerin placed on his home, the letter to the editor, and his appearance on the radio talk shows. He concluded that Kerin's speech other than the house signs involved matters of public concern. He further concluded that the district's interests did not outweigh Kerin's interests.

However, the hearing officer found that the speech in question was not a substantial motivating factor in Kerin's dismissal and that the district would have reached the same decision even in the absence of the speech at issue. It is the latter findings that Kerin contests. However, it is not our function to reweigh that evidence.

On the basis of the record before us, we cannot disagree with the findings of the hearing officer.

■ Kerin also asserts that the hearing officer erred in holding that an individual who claims that he has been subjected to retaliation for exercising his right to petition the government must establish that the subject of his petition is a matter of public concern. However, in *Kemp v. State Board of Agriculture, supra,* our supreme court held that the balancing test is equally applicable in addressing a right to petition. There, the court held that there is no more of an absolute right to petition than there is to engage in speech.

Here, the hearing officer concluded that Kerin's attempt to obtain custody of L.V. was purely a private matter. This conduct in no way related to any matter of political, social, or other concern to the community. He further concluded that the district's interest far outweighs Kerin's interest as a citizen to petition for custody of a student with whom he has entered into a personal relationship. We agree with the hearing officer that Kerin's attempt to gain custody was purely a private matter. Even if we assume that it is not, we agree with the hearing officer that the district's interest outweighs Kerin's interest. *See Kemp v. State Board of Agriculture, supra.*

The order of the school board is affirmed.

HUME and JONES, JJ., concur.