Alfred E. WILDER, Petitioner–Appellant,

v.

**BOARD OF EDUCATION OF JEFFER-SON COUNTY SCHOOL DISTRICT R–1, Respondent–Appellee.**

No. 96CA0709.

Colorado Court of Appeals,
Div. V.

Jan. 23, 1997.

As Modified on Denial of Rehearing
March 27, 1997.

Certiorari Granted Oct. 20, 1997.

P.C., Walter L. Gerash, Denver, for Petitioner–Appellant.

Caplan & Earnest, L.L.C., Alexander Halpern, W. Stuart Stuller, Boulder, for Respondent–Appellee.

Holland & Hart, L.L.P., A. Bruce Jones, Denver, Amicus Counsel for American Civil Liberties Union Foundation of Colorado, Inc.

Opinion by Judge TAUBMAN.

Petitioner, Alfred E. Wilder, seeks review of the order of respondent, Board of Education of Jefferson County School District RJ–1 (Board), that terminated his employment as a nonprobationary teacher with the district. He asserts that the Board's order dismissing him, in part, for showing the film *1900* to his students, in contravention of the hearing officer's recommendation of retention, violated his constitutional rights to freedom of expression, and was arbitrary, capricious, and legally impermissible. We reverse the order of the Board and remand with directions that Wilder be reinstated to his status as a non-probationary teacher.

Wilder had been employed by the school district for 25 years prior to the hearing in this case. From 1980 until 1995, he worked as a language arts teacher at Columbine High School. Between 1973 and 1994, Wilder had received disciplinary memoranda from his principal and assistant principal for a variety of reasons such as tardiness, missing or reporting late for certain non-teaching duties, and failing to complete paperwork on time. However, no formal disciplinary proceedings were brought against him during this period.

In March 1995, Wilder showed portions of the film *1900* to his logic and debate class, in which all the students were at least 17 years old. The film, by Italian director Bernardo Bertolucci, portrays Italian society from 1900 through the end of World War II, focusing on the life of two boys, one rich and one poor. The film, rated "R" by the Motion Picture Association of America, contains scenes involving nudity, sexual conduct, drug use, and violence. After a parent complained about the showing of the film in class, Wilder's principal reviewed the film, and placed Wil-

Colorado Education Association, Martha R. Houser, Gregory J. Lawler, Sharyn E. Dreyer, Cathy L. Cooper, Bradley C. Bartels, Denver, Gerash, Robinson & Miranda,

der on administrative leave the following day pending further investigation.

In August 1995, the school district superintendent recommended to the Board of Education that Wilder be dismissed on grounds of insubordination, neglect of duty, and other good and just cause. Specifically, the charges against Wilder were twofold. First, the superintendent alleged that Wilder's showing of the film *1900* was done in violation of a school district policy and regulation that required teachers to provide their principal with twenty days prior written notice before presenting a "controversial learning resource." Second, the charges alleged that Wilder should be dismissed because of his tardiness, failure to report for certain non-teaching duties, and failure to enforce school rules against eating and drinking in class.

Wilder objected to these charges and requested an evidentiary hearing pursuant to § 22–63–302(3) C.R.S. (1995 Repl.Vol. 9). Following an eight-day administrative hearing, the hearing officer issued a 33–page decision containing her findings of fact and recommendation.

Among other things, the hearing officer found the film *1900* was shown during a portion of each class for three to five days. Discussions about the movie took place in class.

The hearing officer also found that "the evidence is undisputed that *1900* has literary and artistic value." Additionally, the hearing officer found that, as a learning resource, the film was relevant to the curriculum objectives of Wilder's course and that it was useful in contributing to the attainment of the educational objectives. She also found that the themes presented in the movie were useful in trying to teach students to think critically and act responsibly toward others, and that the students in Wilder's class had the ability and maturity to understand the purpose of the movie. The hearing officer could not determine whether the film "did or did not meet community standards," however, but noted that other R-rated movies had been shown to Columbine students without objection.

With respect to the Board's formal written policy and regulation, INB and INB–R, the hearing officer made the following findings of fact: Most teachers at Columbine were not aware of policy INB or the need to give 20 days written notice if a teacher wanted to use a controversial material. Although the policy is contained in the school district's policy books which are kept in each school's library, neither the policy nor the regulation was contained in any faculty handbook. Additionally, Wilder's principal did not recall providing any specific notice on the use of policy INB procedures to his faculty. Further, the principal testified that on the day he took the film from Wilder, he did not mention the policy or the regulation because he did not believe they applied.

Following extensive findings of fact, the hearing officer, on March 14, 1996, made the following recommendation:

> The hearing officer finds that Mr. Wilder's conduct and failing to use the vocabulary workbooks, failing to arrive on time on a regular basis, failing to remain in his class on a consistent and regular basis, and failing to timely exchange books was neglect of duty, insubordination, and/or other and just cause. However, the last act for which Mr. Wilder's being disciplined concerns the use of the film *1900*. Although the hearing officer finds that Mr. Wilder could have and should have done a better job in explaining the nature of the movie prior to showing it, his failure to obtain permission from the principal prior to the showing of the movie was not improper because neither the unwritten policy nor policy INB provides sufficient guidance in determining whether the movie was controversial. In Mr. Wilder's professional judgment, the movie was not controversial and [was] appropriate to the educational goals of the course and the students' level and ability. Furthermore, Mr. Wilder's failure to comply with the twenty-day advance notice requirement of INBR was not improper under these circumstances. Since the last act for which Mr. Wilder is being disciplined is the showing of *1900*, and the policies that Mr. Wilder was suppose[d] to follow are vague, the hearing officer recommends Mr. Wilder's retention.

On April 1, 1996, the Board of Education unanimously adopted a resolution and order of dismissal directing that Wilder be dismissed from his employment as a teacher with the school district for neglect of duty, insubordination, and other good and just cause.

The Board's resolution found that the hearing officer's findings of fact provided sufficient basis to enable it to dismiss Wilder both for his deficiencies concerning non-teaching responsibilities and for his showing of the film *1900.* Specifically, the Board concluded that:

[Mr. Wilder's] absences from the classroom, tardiness, and failure to fulfill his supervisory obligations in the face of repeated memoranda and discussions regarding these duties constitute neglect of duty and insubordination. His failure to follow the curriculum, failure to cooperate with other teachers, and imposition on other teachers to cover his classes constitute neglect of duty and good and just cause for dismissal.

The Board, however, disagreed with the hearing officer's conclusion that, because of the vagueness of the school district policy and regulation regarding teaching about controversial issues and use of controversial learning resources, Wilder should be excused from complying with them. According to the Board, the policy does not require teachers to "guess" as to its application. Further, although the hearing officer found that teachers do not agree regarding what constitutes a controversial learning resource, the Board found that, "an R-rated film containing nudity, sexual conduct, drug use and violence is controversial according to any definition mentioned in the hearing officer's findings." Thus, the Board concluded that the hearing officer's findings showed that Wilder should have "known enough" to seek administrative approval of the film, and that his failure to do so constituted neglect of duty.

Finally, the Board disagreed with the hearing officer's apparent conclusion that Wilder's non-teaching related deficiencies alone did not justify his dismissal because his showing of the film *1900* was "the straw that broke the camel's back." Rather, considering the many findings of misconduct against Wilder, the Board concluded that its determination did not depend upon any one incident.

## I. Standard of Review

Our review is governed by the provisions of the Teacher Employment, Compensation, and Dismissal Act of 1990, §§ 22–63–101 through 22–63–403, C.R.S. (1995 Repl.Vol. 9) (the Act). The Act provides that a teacher who has been the subject of a superintendent's recommendation of dismissal may request a hearing before an impartial hearing officer. The hearing officer is charged by the statute with hearing evidence, reviewing exhibits, and making written findings of fact. Section 22–63–302(8), C.R.S. (1995 Repl.Vol. 9). The hearing officer is to recommend to the Board that the teacher either be retained or dismissed. The Board must then review the hearing officer's findings of fact and recommendation and enter its own order. If the Board rejects the hearing officer's recommendation to retain the teacher, it must state a conclusion, giving its reasons therefor, which must be supported by the record, and its conclusion and reasoning must be included in its written order. Section 22–63–302(9), C.R.S. (1995 Repl.Vol. 9).

A teacher dissatisfied with the school Board's decision may appeal to this court pursuant to § 22–63–302(10), C.R.S. (1995 Repl.Vol. 9).

In construing this statute, the supreme court recently concluded "that the General Assembly intended the Court of Appeals to review the decision of a school board to dismiss a teacher in cases where the hearing officer has recommended retention of the teacher by the same arbitrary, capricious, or legally impermissible standard applicable to cases wherein a school Board's determination to dismiss a teacher coincides with the hearing officer's recommendation." *Adams County School District No. 50 v. Heimer,* 919 P.2d 786, 792 (Colo.1996).

The *Heimer* court further determined that, on appellate review, when neither party questions the hearing officer's findings, the record is limited to those findings plus the hearing officer's recommendation. In that

event, "the focus of the Court of Appeals must shift to a determination of whether the Board's decision was arbitrary, capricious, or legally impermissible in light of the hearing officer's findings of fact." *Adams County School District No. 50 v. Heimer, supra,* at 794.

## II. Dismissal and Violation of Constitutional Rights

■ Wilder contends that the Board violated his constitutional rights to freedom of expression and due process of law by dismissing him for his showing of the film *1900.* He argues that his showing of the film was protected by the First and Fourteenth Amendments and Colo. Const. art. 2, §§ 10 and 25. We do not agree that his use of the film was entitled to blanket constitutional protection, but do agree that, under the circumstances here, his conduct was protected by the First Amendment because Wilder did not have prior notice of the policy and regulation concerning controversial learning resources.

## A. Constitutionally Protected Speech and Board's Legitimate Pedagogical Interests

The parties essentially agree, as do we, that a teacher's classroom speech is constitutionally protected to some extent. *See Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629, 640 (1967) (teacher's freedom of speech is a "special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom"); *State Board for Community Colleges & Occupational Education v. Olson,* 687 P.2d 429 (Colo.1984) (academic freedom protected by First Amendment and includes teacher's interest in choosing particular pedagogical method for presenting idea-content of course, as long as method serves demonstrable educational purpose).

■ However, school officials may properly exercise control over school-sponsored expression so long as their actions are reasonably related to legitimate pedagogical concerns. *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988); *Ward v. Hickey,* 996 F.2d 448 (1st Cir.1993) (*Hazelwood* analysis extends to teacher's classroom speech); *Miles v. Denver Public Schools,* 944 F.2d 773 (10th Cir.1991) (same).

Here, because we conclude that Wilder's First Amendment rights were violated by his not having received notice of the Board's policy and regulation, we need not address whether his First Amendment right to use a particular teaching method outweighs the Board's legitimate pedagogical interests in regulating course content. *See Boring v. Buncombe County Board of Education,* 98 F.3d 1474 (4th Cir.1996) (*Hazelwood* requires application of balancing test); *Lacks v. Ferguson Reorganized School District, R–2,* 936 F.Supp. 676 (E.D.Mo.1996) (*Hazelwood* requires balancing competing interests of school and teacher, considering, *inter alia,* age and sophistication of students, relationship between teaching method and valid educational objective, and context and manner of presentation).

## B. Lack of Clear Prior Notice

Wilder asserts that, even if the Board may properly regulate the showing of movies such as *1900,* it cannot do so in the absence of clear prior notice that such action is prohibited. His argument is threefold: (1) that although the school district has a written policy and regulation, no notice of them had ever been given to him or his colleagues; (2) that because the formal charges against him with respect to the film *1900* only alleged violation of the Board's formal policy and regulation, Wilder may not be terminated for violation of an unwritten policy; and (3) that the formal policy and regulation are unconstitutionally vague. We agree with the first two arguments and, therefore, do not need to address the third.

In essence, Wilder argues that, since the school district did not provide clear notice of prohibited classroom conduct, any disciplinary action taken against him concerning the showing of the film *1900* cannot be *reasonably related* to legitimate pedagogical concerns. We agree.

### 1. Lack of Notice of Formal Policy

Section 22-63-302, C.R.S. (1995 Repl.Vol. 9) requires that dismissal not be arbitrary, capricious, or legally impermissible. Dismissing a teacher for engaging in protected speech or otherwise exercising his or her constitutional rights would be contrary to law and, hence, legally impermissible. *Kerin v. Board of Education,* 860 P.2d 574 (Colo.App. 1993).

■ We agree that the appropriate test is that formulated in *Ward v. Hickey, supra,* 996 F.2d at 452:

A school committee may regulate a teacher's classroom speech if: (1) the regulation is reasonably related to a legitimate pedagogical concern ... and (2) the school provided the teacher with notice of what conduct was prohibited.

■ Under this standard then, a teacher is entitled to notice of what classroom conduct is prohibited, and a school district cannot retaliate against speech that it did not prohibit. *Ward v. Hickey, supra. See also Lacks v. Ferguson Reorganized School District R-2, supra* (school board policy which prohibited student profanity, but which had not been applied to students' use of profanity in creative works, may not be used as a basis for termination of teacher, when evidence did not establish that teacher or anyone else knew policy would be so applied).

In its decision, the Board did not specifically address whether Wilder had been given adequate notice of the policy and regulation. However, it concluded that Wilder "should have known enough to seek administrative approval of the film." The board's bases for so concluding were that the hearing officer had found that copies of Board policies were available in the school library, that Wilder had previously viewed the film, that teachers had discussed in Wilder's presence the need to obtain administrative approval for controversial material, and that a faculty meeting had been held at the school to discuss the showing of another "R" rated movie.

In our view, the only one of these factors that goes to the question of Wilder's notice of the Board's policy and regulation is the availability of such policy and regulation in the school library. However, the school board must base its decision on the hearing officer's finding of fact, and may not pick and choose among them so as to reach a conclusion inconsistent with the hearing officer's findings of fact.

■ While the Board is free to make its own findings of ultimate fact, it must base its ultimate findings of fact upon a fair reading of the hearing officer's findings of historical fact. *See Adams County School District No. 50 v. Heimer, supra.* Such was not done here.

■ The parties also agree that First Amendment questions of constitutional fact compel de novo appellate review. *Reddick v. Craig,* 719 P.2d 340 (Colo.App.1985). Such review supports the hearing officer's findings that the written policy and regulation at issue here were not contained in faculty handbooks, that most teachers at Columbine were not aware of the policy, and that Columbine's principal did not believe the policy applied to Wilder's showing of the film. Further, although the hearing officer found that the policy and regulation were contained in policy books in the school library, the record indicates only that such books were supposed to be there. Thus, a fair reading of the hearing officer's findings of fact leads to the conclusion that Wilder was not provided with notice of the provisions of the formal policy and regulation.

We conclude that, absent a finding that Wilder had actual knowledge of that policy or that the policy was contained in some document that Wilder was required by Board policy to read, the board's decision was arbitrary and capricious and cannot stand. *See Ward v. Hickey, supra.* In the absence of Wilder's knowledge of the policy and regulation requiring advance review of the movie, the Board's termination decision violated Wilder's First Amendment interest in choosing a particular pedagogical method for a course.

### 2. Unwritten Policy

■ Wilder next contends that he may not be terminated for violating an unwritten policy that teachers using a controversial materi-

al must have it reviewed by the principal prior to use.

The hearing officer recognized that the formal charge against Wilder did not allege the violation of any unwritten policy, but nevertheless found that, in March 1995, an unwritten policy existed "that if a material is controversial, it should be cleared with the principal." She further found that Wilder was aware of such a policy.

Although the Board's decision did not specifically address the unwritten policy, it concluded that Wilder "should have known enough" to seek administrative approval of the film, in part, because teachers had discussed in his presence the need to obtain administrative approval for controversial material. The Board also found that, in the exercise of his professional judgment, Wilder should have known that administrative approval should be obtained before the use of an R-rated film containing nudity, sexual conduct, drug use, and violence. Without expressly so stating, these conclusions are based upon the unwritten policy found to exist by the hearing officer.

Section 22–63–302(8), C.R.S. (1995 Repl. Vol. 9) provides that: "The chief administrative officer shall have the burden of proving that his recommendation for the dismissal of the teacher was for the reasons given in the notice of dismissal and that the dismissal was made in accordance with the provisions of this article."

In construing statutes, courts must give effect to the intent giving rise to the legislation. To carry out that responsibility courts first look to the statutory language itself, giving words and phrases their commonly accepted and understood meaning. *Resolution Trust Corp. v. Heiserman,* 898 P.2d 1049 (Colo.1995).

■ Based upon the plain language of this statute, we hold that a school district's decision to terminate a teacher must be based only upon the reasons contained in the superintendent's formal recommendation of dismissal.

Here, the school superintendent's recommendation for dismissal, insofar as it related to the showing of the film *1900,* alleged only

the violation of policy INB and its supporting regulation INB–R.

Thus, to the extent that the Board's decision is based upon the conclusion that Wilder violated the Board's unwritten policy, it is legally impermissible and may not stand. *See* § 22–63–302(8).

### III.  Other Misconduct as Basis for Dismissal

■ We reject the school district's argument that, even if Wilder's constitutional rights were violated, his dismissal was nevertheless lawful and permissible because of Wilder's other misconduct unrelated to the showing of the film *1900.*

The school district's contention is based upon the standard established in *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). There, the Supreme Court held that where an employment termination decision is said to be based on both constitutionally protected speech or expression and other non-constitutionally based conduct, the employee must first establish that the protected expression was a substantial or motivating factor in the employer's decision. If the employee can do so, the employer may then defeat this showing by proving that it would have reached the same decision even in the absence of the protected conduct. *See Moore v. City of Wynnewood,* 57 F.3d 924 (10th Cir.1995); *Kemp v. State Board of Agriculture,* 803 P.2d 498 (Colo. 1990).

We have concluded that the Board's termination decision was based in part on Wilder's constitutionally protected speech or expression.

■ The determination of whether an employee's protected expression was a substantial or motivating factor in the termination decision and whether the employer would have made the decision in the absence of the protected expression is a determination of fact to be made by the fact finder in the case. *Melton v. City of Oklahoma City,* 879 F.2d 706 (10th Cir.1989).

Here, the hearing officer found that showing the film *1900* was "the straw that broke the camel's back," and "but for this action, no dismissal proceedings would have been instituted." We are bound by this finding of fact.

In interpreting *Mount Healthy*, several federal courts have held that an employer cannot prove that it would have reached the same decision by showing merely that it *could* have reached that decision, or that it had a legitimate basis for reaching that decision apart from the protected expression. *Bradley v. Pittsburgh Board of Education*, 913 F.2d 1064 (3d Cir.1990); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310 (9th Cir. 1989). As declared in *Bradley v. Pittsburgh Board of Education, supra*, 913 F.2d at 1075:

> *Mount Healthy* requires more than a showing that [the employer] *could* properly terminate an employee. It requires a showing that the employer *would have* terminated the employee in the absence of his protected activity. (emphasis in original)

We conclude that this interpretation comports with language in *Mount Healthy* that its rule of causation is intended to place an employee in no worse a position than if he or she had not engaged in constitutionally protected conduct.

Accordingly, we reject the school district's reliance on *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), where, *in dicta*, the Supreme Court indicated that, in a mixed motive case, if the lawful reason alone would have sufficed to justify firing, the employee could not prevail in a suit against the employer. To the contrary, the Supreme Court emphasized that, in a mixed motive case, proving that the same termination decision would have been justified is not the same as proving that the same termination decision would have been made.

Thus, *McKennon* affords no basis for concluding that the Supreme Court intended to depart from the *Mt. Healthy* rule of causation.

We also note that, for at least four months prior to the showing of the movie, no disciplinary action was taken against Wilder for his alleged prior misconduct. *See Adams*

*County School District No. 50 v. Heimer, supra; see also Sagendorf–Teal v. County of Rensselaer*, 100 F.3d 270 (2d Cir.1996) (if nonconstitutional circumstances warranting discharge of public employee were known to public employer prior to discharge for protected speech, employee may not be terminated unless employer's adverse action would have been taken on same day action occurred in absence of protected speech). Therefore, we conclude that the record supports the ALJ's determination that Wilder's showing of the film *1900* was a motivating factor in his dismissal and that the school district has not shown that it in fact would have brought dismissal charges against Wilder in the absence of his showing of the movie.

Hence, Wilder's dismissal may not be sustained by reference to his other misconduct.

Because of our disposition of these issues, we need not address other issues raised by Wilder.

The order of the Board is reversed and the cause is remanded to the Board with directions to reinstate Wilder to his position as a full-time, non-probationary teacher with no loss to him of any pay, seniority, or other employment benefits which he might otherwise have sustained as a result of the Board's decision.

RULAND, J., concurs.

JONES, J., specially concurs.

Judge JONES specially concurring.

I concur completely with the majority that the Board's order was arbitrary, capricious, and legally impermissible. I write separately, however, in the area having to do with prior clear notice. I believe that, while no notice of the written policy was given Wilder, and that he cannot be terminated for violation of an unwritten policy, it is useful to reflect on the unconstitutional vagueness of the formal policy.

I agree with Wilder that the Board erred in concluding that school district policy INB is not unduly vague. I believe the hearing officer properly determined that "neither the unwritten policy nor policy INB gives fair

warning to Mr. Wilder that a film such as *1900* is a controversial learning source."

### I.

I first reject the Board's contention that Wilder lacked standing to make a vagueness challenge.

Relying on *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), the Board argues that a person who engages in conduct that is clearly proscribed by a challenged regulation cannot complain of the vagueness of the regulation as applied to the conduct of others. Thus, the Board contends that, because Wilder's colleagues clearly knew that showing films depicting sex, nudity, violence, and profanities fell within the scope of the school district's policy, Wilder cannot complain of the application of the policy to him.

I conclude, however, that because a stricter vagueness test applies when the exercise of constitutional rights is implicated, Wilder does have standing to challenge the Board policy on vagueness grounds. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., supra.*

### II.

In *Parrish v. Lamm*, 758 P.2d 1356 (Colo. 1988), the supreme court set forth the standards and competing interests that underlie a void-for-vagueness challenge. A regulation offends due process of law if it is so vague that it does not provide fair warning of the conduct prohibited or if its standards are so ill-defined as to create a danger of arbitrary and capricious enforcement. On the other hand, a regulation is not void for vagueness if it fairly describes the conduct forbidden and if persons of common intelligence can readily understand its meaning and application. The vagueness test is a pragmatic test to ensure fairness. The regulation at issue must strike a balance between the potentially conflicting concerns of giving fair warning of prohibited conduct yet being sufficiently general to address a problem under varied circumstances and during changing times.

Further, as noted a more strict vagueness test applies when the regulation at issue threatens to inhibit the exercise of constitutionally protected rights. *Parrish v. Lamm, supra; Bradley v. Pittsburgh Board of Education*, 913 F.2d 1064 (3rd Cir.1990).

Fundamentally speaking, governmental pronouncements that regulate First Amendment activities must be narrowly drawn to address certain, specific evils. *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). "Because First Amendment freedoms need breathing space to survive, government may regulate in [such areas] only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418 (1963).

Thus, greater precision and specificity are necessarily required in regulatory areas that could tend to impinge on First Amendment freedoms because vagueness in such areas threatens exercise of such freedoms, raises dangers of arbitrary and discriminatory application of the regulations, and traps the innocent. *See Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Cohen v. San Bernardino Valley College*, 92 F.3d 968 (9th Cir.1996); *Adamian v. Jacobsen*, 523 F.2d 929 (9th Cir.1975).

However the parameters of necessary specificity need not be pointed out here because the terms of the unwritten policy and policy INB are demonstrably unconstitutionally vague.

### III.

Wilder's vagueness challenge focuses on two provisions of policy INB. Those provisions state as follows:

Controversial issues include matters characterized by significant differences of opinion usually generated from differing underlying values, beliefs and interests, which produce significant social tension and which are not necessarily resolvable by reference to accepted facts. Matters usually become controversial not so much due to disagreement about facts, but as to the interpretation of values to be applied to facts.

. . . .

Controversial learning resources include learning resources which are not included in the approved learning resources of the school district and which are subject to disagreement as to appropriateness because they refer or relate to *controversial issues* or present material in manner or context which is itself controversial. It is expected that teachers will work cooperatively with their principal and other administrators in the use of controversial learning resources. (emphasis added)

Here, the hearing officer found that teachers had different definitions for controversial material. She further concluded that persons of ordinary intelligence must guess at the meaning of a controversial learning resource.

The Board rejected these conclusions of the hearing officer, finding that policy INB is not unduly vague and does not require teachers to guess at its application. The Board determined that because of the wide variety of potentially controversial issues and resources, and to avoid unduly restricting the choices available to teachers, the definitions in policy INB are necessarily general and depend to some extent on the exercise of sound professional judgment. The Board further noted that the policy specifically defined controversial learning resources.

Additionally, the Board concluded that, to avoid misunderstandings, a teacher need only discuss the use of a proposed educational resource with his or her principal. Finally, the Board determined that, although the hearing officer had found that teachers disagree regarding what constitutes a controversial learning resource, "an R-rated film containing nudity, sexual conduct, drug use and violence is controversial according to any definition mentioned in the hearing officer's findings."

I conclude that the definitions of "controversial issues" and "controversial learning resources" contained in policy INB are unconstitutionally vague because their standards are so ill-defined as to create the very real threat of the dangers mentioned above in this special concurrence, including those of arbitrary and capricious enforcement. Thus, the definition of "controversial issues" as including "matters characterized by significant differences of opinion usually generated from differing underlying values, beliefs and interests, which produce significant social tension and which are not necessarily resolvable by reference to accepted facts" is sufficiently imprecise that it embraces a wide spectrum of subjects which might be required to be taught in classes in the areas of social studies, science, history, and language arts.

The definition of "controversial learning resources" is similarly infirm because it refers to "controversial issues" or to the presentation of material "in manner or context which is itself controversial." In my view, this language does not provide fair warning to teachers as to what teaching resources are subject to policy INB and regulation INB–R.

I note that while the policy and regulation are contained in a four page single-spaced document, they contain no warning to teachers that materials containing nudity, sexual conduct, violence, or profanity are or might be considered "controversial learning resources" subject to the school district policy and regulation.

According to the hearing officer, the "evidence is undisputed" that the subject film has artistic and literary value. She found it relevant to the curriculum objectives of the course and that it was useful in contributing to attainment of educational objectives. The film was determined to be useful in teaching students critical thinking and responsible actions toward others, and to be age-appropriate in the educational setting in which it was shown. Wilder did not consider the movie to be controversial.

The record reflects that policy INB and regulation INB–R are so vaguely worded, and so unspecific, as to have given Wilder no notice that the policy would be applied in such a way as to punish his use of what the record reflects is a useful teaching tool that meets legitimate pedagogical concerns. I conclude that the policies are simply too vague as applied to Wilder here. *See Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Cohen v. San Bernardino Valley College, supra.*

Thus, I would also reverse on grounds that the subject policies of the Board are unconstitutionally vague.