**BOARD OF EDUCATION OF JEFFER-SON COUNTY SCHOOL DISTRICT R–1, Petitioner,**

v.

**Alfred E. WILDER, Respondent.**

No. 97SC292.

Supreme Court of Colorado,
En Banc.

June 29, 1998.

Caplan & Earnest, LLC, Alexander Halpern, W. Stuart Stuller, Boulder, for Petitioner.

Colorado Education Association, Sharyn E. Dreyer, Gregory J. Lawler, Martha R. Houser, Cathy L. Cooper, Bradley C. Bartels, Denver, for Respondent.

Colorado Association of School Boards, Lauren B. Kingsbery, Julie Murphy Seavy, Denver, for Amicus Curiae Colorado Association of School Boards.

National School Boards Association, Gwendolyn H. Gregory, Deputy General Counsel, August W. Steinhilber, Alexandria, VA, for Amicus Curiae National School Boards Association.

Holland & Hart, A. Bruce Jones, Alan N. Stern, David Lazerwitz, Denver, American Civil Liberties Union of Colorado, Mark Silverstein, Denver, for Amicus Curiae American Civil Liberties Union Foundation of Colorado.

Chief Justice VOLLACK delivered the Opinion of the Court.

We granted certiorari to review the court of appeals decision in *Wilder v. Board of Education,* 944 P.2d 598 (Colo.App.1997), to determine whether the Board of Education of Jefferson County (the Board) rightfully dismissed high school teacher Alfred E. Wilder (Wilder) for violating its controversial materials policy. The court of appeals concluded that the dismissal was arbitrary, capricious, and legally impermissible. As a result, the court of appeals ordered that Wilder be reinstated. We reverse and remand with instructions.

I.

In 1970, Jefferson County School District No. R–1 (the District) hired Wilder as a social studies teacher at Lakewood High School. Shortly thereafter, Wilder transferred to Bear Creek High School, where he served as an assistant principal. During his early years at Bear Creek, Wilder received favorable evaluations. However, in 1973 and 1974, Wilder frequently arrived late, had problems with attendance, and failed to communicate with the rest of the staff. Consequently, Wilder received an official memorandum from the principal regarding his lack of dependability.

In 1979, Wilder transferred to Alameda High School, where he also served as an assistant principal. On one occasion, Wilder failed to appear for required staffing duties, which he blamed on a miscommunication. However, a school administrator found Wilder's excuse to be fallacious and distorted. Citing concerns about Wilder's mental stability, the District authorized him to take a leave of absence without pay, which Wilder accepted.

Beginning in 1980, Wilder returned to teaching as a language arts instructor at Columbine High School. While at Columbine, Wilder received periodic evaluations, all of which noted that he established good rapport with his students and engaged in innovative teaching. However, the evaluations also documented Wilder's chronic problems in fulfilling his administrative and classroom responsibilities. For instance, Wilder was frequently reprimanded for leaving his classes unattended. At one point, Wilder was leaving his classroom unattended seven

to nine times per week to get something to drink, to use the restroom, or to make a telephone call. Although Wilder often asked fellow teachers to watch his classes, they eventually declined to do so when his behavior encroached on their own obligations. The administration notified Wilder of this problem through written memoranda in November 1992, December 1992, January 1993, and August 1994. Besides leaving his classes unattended, Wilder also neglected scheduled meetings with parents, failed to implement the department curriculum, and worked uncooperatively with other teachers.

In spring 1995, Wilder was teaching logic and debate to seniors at Columbine. For a period of several days in March, Wilder showed his class portions of the film *1900*, which depicts the rise of fascism in Italy from 1900 through World War II. The film portrays this period through the eyes of two Italian boys, one rich and one poor, while charting their transformation into adulthood. *1900* is rated "R" by the Motion Picture Association of America. It contains full frontal nudity, oral sex, masturbation, profanity, cocaine abuse, and graphic violence.[1]

Wilder showed this material to his class without notifying Columbine principal Ronald Mitchell (Principal Mitchell), pursuant to the District's controversial materials policy. This policy requires teachers in the District to exercise special care when using "controversial learning resources":

Controversial learning resources include learning resources which are not included in the approved learning resources of the district and which are subject to disagreement as to appropriateness because they refer or relate to controversial issues or present material in a manner or context which is itself controversial. It is expected that teachers will work cooperatively with their principal and other administrators in the use of controversial learning resources.

The policy also provides teachers with specific guidelines to be followed in using such resources:

1. [C]ontroversial learning resources are permitted in accordance with this regulation as long as the issue or resource is relevant to the curriculum objectives of the course.

. . . .

8. The principal must be informed in writing of all planned teaching of controversial issues or use of controversial learning resources as soon as reasonably possible and, in any case, not less than 20 working days in advance of their presentation to students. Such notification must include an identification of the controversial issue or resource, a description of the proposal and a statement of the educational purpose of the proposal.[2]

After the first class in which *1900* was shown, one of Wilder's students asked why they were watching the film. Wilder responded that if any students felt embarrassed or uncomfortable they could look away or put their heads down. He also offered them the option of going to the library for an alternate assignment. Although no students went to the library, several of

---

1. In one scene, a woman is paid to have sex with the two main characters. The trio undresses and climbs into bed, with the woman in the middle. All three are shown from the waist up, as the woman masturbates both men simultaneously. The entire scene lasts several minutes, during which time the woman and the men are shown fully nude from the front on several occasions. In another scene, a young woman lifts her dress and pushes her boyfriend's face between her legs, and he performs oral sex. On another occasion, a man tromps barefoot in manure, muttering "milk and shit, milk and shit," as he watches a young girl milk a cow. After complaining to the girl that he can no longer get "hard," the man opens his pants, stands in front of the girl, and tells her to insert her hand. She obeys.

Besides nudity and sexual conduct, *1900* contains drug abuse and graphic violence. In one scene, two men and a woman in a hotel room decide to use cocaine. They cut the cocaine on a mirror, bicker over it, spill some on the floor, and eventually snort it. For several minutes, one man crawls on the floor and the other takes photographs as the woman dances about the room with her breasts exposed. In other scenes, a person intentionally cuts off his own ear, and a man kills a child by bashing its head against a wall.

2. The policy is set forth in District policy INB and supporting regulation INB-R.

them stated that watching *1900* made them uncomfortable. When one student complained at home, her mother phoned Principal Mitchell, concerned that the school had been showing her daughter a film with nudity and strong sexual content. Principal Mitchell confronted Wilder, who admitted that the film contained graphic subject matter. After screening portions of *1900*, Principal Mitchell and other school administrators agreed that the film was a controversial learning resource and that Wilder should have obtained administrative approval prior to showing the film.

On March 16, 1995, Principal Mitchell placed Wilder on administrative leave, pending further action by the District. In August 1995, superintendent of schools Dr. Wayne Carle (Superintendent Carle) determined that by failing to provide the principal with twenty days' notice prior to showing *1900*, Wilder violated the District's controversial materials policy. Based on this violation and other prior misconduct, Superintendent Carle recommended that Wilder be dismissed for "insubordination, neglect of duty, and other good and just cause," pursuant to section 22–63–301, 7 C.R.S. (1997).[3] Wilder appealed this recommendation before a hearing officer, as provided by section 22–63–302, 7 C.R.S. (1997), claiming that the dismissal violated his constitutional rights of free speech and due process.

After making extensive findings, the hearing officer concluded that Wilder's actions constituted "neglect of duty, insubordination, and/or other and just cause." Nevertheless, the hearing officer recommended that Wilder be retained because the District's policy lacked "sufficient guidance in determining whether the movie was controversial." In April of 1996, the Board rejected the hearing officer's recommendation and adopted an order dismissing Wilder. The Board found that dismissal was warranted by Wilder's history of not fulfilling his official responsibilities and by his failure to follow the controversial materials policy prior to showing *1900*.

The court of appeals reversed, holding that the dismissal "violated Wilder's First Amendment interest in choosing a particular pedagogical method." *Wilder*, 944 P.2d at 603. Citing section 22–63–302(8), the court of appeals also determined that Wilder's dismissal was improper because it was not based on the reasons listed in Superintendent Carle's formal recommendation of dismissal. Concluding that the Board's dismissal order was arbitrary, capricious, and legally impermissible, the court of appeals remanded the cause to the Board with directions to reinstate Wilder.

## II.

■ "[P]ublic education in our Nation is committed to the control of state and local authorities." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). As a result, local authorities have broad discretion in selecting teachers, regulating their pedagogical methods, and choosing a suitable curriculum. *See Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); *Webster v. New Lenox Sch. Dist. No. 122*, 917 F.2d 1004, 1007 (7th Cir.1990); *State Bd. for Community Colleges and Occupational Educ. v. Olson*, 687 P.2d 429, 438 (Colo.1984). In Colorado, our Constitution vests local school boards with "control of instruction in the public schools." *See* Colo. Const. art. IX, § 15. School boards are authorized to establish an appropriate curriculum. *See* § 22–32–109(1)(t), 7 C.R.S. (1997). In accordance with statutory requirements, school boards also control the hiring and firing of teachers. *See* §§ 22–63–201 to –301, 7 C.R.S. (1997). Dismissal of a tenured teacher must be based on specific grounds, which include neglect of duty, unsatisfactory performance, insubordination, or other good and just cause. *See* § 22–63–301. In addition, a school board's decision to dismiss a teacher must not be arbitrary, capricious, or legally impermissible. *See* § 22–63–302(10)(c).

---

**3.** Section 22–63–301 sets forth the permissible grounds for dismissing a tenured teacher, including those listed by Superintendent Carle.

The dismissal of a teacher must respect the requirements of the First Amendment. *See Olson*, 687 P.2d at 438. However, "the First Amendment has never required school districts to abdicate control over public school curricula to the unfettered discretion of individual teachers." *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 795 (5th Cir.1989). While the United States Supreme Court has not spoken directly on the issue of teacher curriculum control, it established a standard for regulating school-sponsored expression in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). In *Hazelwood*, public high school students wrote two articles for their school newspaper, one on teen pregnancy and the other on students whose parents had divorced. As part of the regular practice at the school, the supervising teacher submitted the articles to the principal for approval prior to publication. Concerned over the content and timing of the articles, the principal deleted them from the newspaper. In holding that the principal did not violate the students' First Amendment rights, the Supreme Court distinguished between "personal expression that happens to occur on the premises" and "school-sponsored ... expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Id.* at 271, 108 S.Ct. 562. Concluding that the students' articles constituted school-sponsored expression, the Court held that educators could constitutionally regulate that form of student speech, so long as such regulation was "reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. 562.

Although *Hazelwood* dealt with student speech, its standard has been applied in cases involving teacher speech and curriculum control. *See Miles v. Denver Pub. Sch.*, 944 F.2d 773 (10th Cir.1991); *Kirkland*, 890 F.2d 794; *Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364 (4th Cir.1998).[4] *Miles* involved the First Amendment claim of a ninth-grade government teacher, who commented during class on a rumor that two students had been seen having sexual intercourse on the school tennis court. The parents of the students complained to the principal, who placed the teacher on administrative leave and issued a written reprimand, stating that the teacher broached "an inappropriate topic for comment in a classroom setting." The teacher filed a civil rights suit, claiming that these actions violated the First Amendment and chilled his free speech rights. The Tenth Circuit concluded that the *Hazelwood* standard applied because the teacher's comments constituted school-sponsored speech: "We are convinced that if students' expression in a school newspaper bears the imprimatur of the school [as in *Hazelwood* ], then a teacher's expression in the 'traditional classroom setting' also bears the imprimatur of the school." *Miles*, 944 F.2d at 776. Holding that the principal's actions were directly related to the school's legitimate pedagogical interests, the court found the teacher's classroom comments were not protected by the First Amendment. *See id.* at 778, 779.

In *Kirkland*, the Fifth Circuit addressed the issue of whether the First Amendment empowered a high school history teacher to change the school's official reading list without administrative approval. Before the start of the school year, the teacher received the approved reading list for history classes, together with guidelines for amending the list. According to the guidelines, teachers could use materials not on the approved list, provided they obtained permission from school administrators. Nevertheless, the teacher implemented a list of his own choosing, without affording administrators the opportunity to review and approve his list. School officials decided that the teacher, who had probationary status, would not receive a new contract, citing his unilateral decision to use nonapproved reading materials. The teacher brought suit, arguing that the school had retaliated against him for engaging in constitutionally protected speech. Applying *Hazelwood*, the court noted that "[p]ublic schools have a legitimate pedagogical interest

4. *Hazelwood* also recognized that where legitimate pedagogical concerns are at stake, "school officials may impose reasonable restrictions on the speech of students, *teachers,* and other members of the school community." *Hazelwood,* 484 U.S. at 267, 108 S.Ct. 562 (emphasis added).

in shaping their own secondary school curricula." *Kirkland*, 890 F.2d at 795. Consequently, the court ruled that the teacher's use of his reading list without prior approval was not constitutionally protected: "[T]he first amendment does not vest public school teachers with authority to disregard established administrative mechanisms for approval of reading lists." *Id.*

Finally, the Fourth Circuit held in *Boring* that a high school teacher had no First Amendment right to control the curriculum of her advanced acting class by selecting and producing a particular play. In preparation for a statewide competition, the teacher chose a play, which according to the teacher, portrayed a dysfunctional single-parent family that included a lesbian daughter and another daughter who became pregnant out of wedlock. The superintendent transferred the teacher, noting that she had failed to follow the district's controversial materials policy. The court rejected the teacher's claim that the transfer amounted to unconstitutional retaliation, stating that her selection of the controversial play "does not constitute protected speech and has no First Amendment protection." *Boring*, 136 F.3d at 369.

Like the teachers in *Miles, Kirkland*, and *Boring*, Wilder claims that he was punished for exercising his free speech rights. We disagree. As *Hazelwood* and its progeny demonstrate, the First Amendment allows extensive regulation of school-sponsored expression. Such expression includes that which "may fairly be characterized as part of the school curriculum." *Hazelwood*, 484 U.S. at 271, 108 S.Ct. 562. As used in this context, "curriculum" refers to those activities bearing the "imprimatur of the school" that are "supervised by faculty members and designed to impart particular knowledge or skills to student participants." *Id.* According to Wilder, *1900* was shown to provide his students with a historical context for understanding literature from the period depicted in the film. More importantly, *1900* was shown in the classroom, during class time, and under Wilder's direct supervision. As such, Wilder's use of *1900* constituted "curriculum" for purposes of the First Amendment. *See id.* at 271, 108 S.Ct. 562; *see also*

*Ward v. Hickey*, 996 F.2d 448, 453 (1st Cir. 1993) ("[A] teacher's classroom speech is part of the curriculum."). Thus, pursuant to *Hazelwood*, the District was entitled to regulate the showing of *1900*, as long as the regulations were "reasonably related to a legitimate pedagogical concern." *See Hazelwood*, 484 U.S. at 273, 108 S.Ct. 562.

Here, the District sought to regulate the use of films such as *1900* through its controversial materials policy. Pursuant to the policy, teachers are required to notify administrators when they intend to use materials that (1) have not been previously approved by the District, and (2) qualify as "controversial learning resources." Specifically, teachers must give written notice to their principals at least twenty days before presenting such materials to their students.

These requirements address legitimate pedagogical concerns. As noted in *Kirkland*, "[p]ublic schools have a legitimate pedagogical interest in shaping their own secondary school curricula." *Kirkland*, 890 F.2d at 795. Similarly, *Hazelwood* acknowledged that school officials must be able to control school-sponsored speech on "potentially sensitive topics," to account for the emotional maturity of the intended audience. *See Hazelwood*, 484 U.S. at 272, 108 S.Ct. 562. *Hazelwood* also specified that school officials must retain the authority to control school-sponsored speech "that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the shared values of a civilized social order." *Id.* (internal citation and quotation marks omitted).

Similar interests are promoted by the District's controversial materials policy. The policy applies when teachers wish to use "learning resources which are not included in the approved learning resources of the district." Because such resources have not been officially approved, school administrators have not determined whether they are suitable for a particular audience of students. By allowing administrators greater control over the curriculum, the policy prevents students from being exposed to graphic sex, violence, vulgarity, or similar material. Controlling the entry of such subject matter into

the classroom is plainly a legitimate pedagogical concern. *See Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (recognizing legitimate school interest in regulating exposure to sexually explicit or vulgar speech); *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 871, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (recognizing legitimate school interest in controlling the "educational suitability" of curricular materials).

Furthermore, the controversial materials policy addresses this legitimate concern in a reasonable manner. The policy does not ban the use of controversial learning resources, nor does it mandate the automatic dismissal of teachers who use such resources.[5] Instead, it requires that teachers who wish to use a controversial learning resource must provide the principal with at least twenty days written notice before the resource is presented to students. This requirement is directly related to the legitimate concerns underlying the policy: it allows learning resources dealing with "potentially sensitive topics" to be reviewed by the principal *before* they enter the classroom. *See Hazelwood,* 484 U.S. at 272, 108 S.Ct. 562. After reviewing the resources, the principal, based on guidelines in the policy, approves or disapproves their use in the classroom. Teachers who are dissatisfied with the principal's decision may appeal to the superintendent. If they are dissatisfied with the superintendent's decision, they may appeal again to the Board. This is a reasonable procedure for monitoring curricular content in the public schools.

The controversial materials policy permits the District to control nonapproved resources that teachers wish to introduce as part of the curriculum. Such control clearly belongs to school officials, who are accountable to the public:

> Parents have a vital interest in what their children are taught. Their representatives have in general prescribed a curriculum. There is a compelling state interest in the choice and adherence to a suitable curriculum for the benefit of our young citizens and society. It cannot be left to individual teachers to teach what they please.

*Palmer v. Board of Educ.,* 603 F.2d 1271, 1274 (7th Cir.1979); *accord Boring,* 136 F.3d at 370 ("[T]he school, not the teacher, has the right to fix the curriculum."). Provided that official curriculum controls are "reasonably related to legitimate pedagogical concerns"— as is the case with the District's controversial materials policy—they do not violate the free speech rights guaranteed by the First Amendment. *See Hazelwood,* 484 U.S. at 273, 108 S.Ct. 562.[6] As a result, Wilder has no First Amendment right to use nonapproved controversial learning resources in his classroom without following the District's policy.[7]

## III.

◾ Wilder also claims that the District's policy is unconstitutionally overbroad. We disagree.

◾ A law is overbroad if it burdens conduct protected by the First Amendment. *See Broadrick v. Oklahoma,* 413 U.S. 601, 93

---

5. As the hearing officer noted, "Wilder was not prohibited from using controversial materials, but was required to follow certain guidelines." However, we do not decide whether a full prohibition would be reasonable. We simply note that this is not the case before us.

6. However, official regulation of public school curricula may be more limited when such regulations implicate the Establishment Clause of the First Amendment. *See, e.g., Epperson v. Arkansas,* 393 U.S. 97, 107, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

7. We reach this conclusion despite observing in *Olson* that the principle of academic freedom found in the First Amendment creates an "inter-

est in choosing a particular pedagogical method for presenting the idea-content of a course." *Olson,* 687 P.2d at 437. However, *Olson* involved academic freedom at the college level. By contrast, "in primary and secondary schools the principle of academic freedom must be balanced by the countervailing interest of the state in inculcating basic community values in students who may not be mature enough to deal with the educational process as understood and practiced at higher educational levels." *Id.* at 438 n. 7. Accordingly, we conclude that the principle of academic freedom does not permit secondary school teachers such as Wilder to override official school regulations that are otherwise reasonably related to legitimate pedagogical concerns.

S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Aguilar v. People*, 886 P.2d 725, 727 (Colo.1994). To be unconstitutional, a law's overbreadth must be substantial, meaning that the burden on protected speech is substantial as compared with the burden on unprotected speech. *See Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908; *People v. Batchelor*, 800 P.2d 599, 601 (Colo. 1990). Overbroad laws may be challenged even by parties whose speech is not protected by the First Amendment. *See Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 798–99, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *People ex rel. Simpson v. Highland Irrigation Co.*, 893 P.2d 122, 128, n. 10 (Colo.1995). Such facial challenges are permitted to protect the rights of third parties whose First Amendment rights may be "chilled" by the law's overbreadth. *See* Laurence H. Tribe, *American Constitutional Law* 1035 (2d ed.1988). By definition, those parties will never possess the injury-in-fact required for standing because they abstain from protected speech to avoid condemnation under the overbroad law. *See id.*

Wilder asserts that even if the controversial materials policy does not violate his right of free speech, it is overbroad because it burdens the protected speech of other teachers. However, in regard to any teacher, the policy covers only "learning resources" that the teacher wishes to introduce in the classroom. Because such resources bear the "imprimatur of the school," they constitute "school-sponsored speech" and may be regulated according to the standards set forth in *Hazelwood*. As discussed previously, the District's policy complies with *Hazelwood* and therefore does not offend the First Amendment. Because the policy neither "chills" the First Amendment rights of teachers in the District nor otherwise burdens their constitutionally protected speech, it is not unconstitutionally overbroad.

8. While the doctrines of vagueness and overbreadth are often interrelated, they are conceptually distinct. Whereas an overbroad law substantially burdens protected speech, an impermissibly vague law fails to provide fair notice of what conduct is prohibited and allows arbitrary and discriminatory enforcement. *See Grayned v. City of Rockford*, 408 U.S. 104,

## IV.

▆▆ Wilder further argues that the District's controversial materials policy is impermissibly vague. We disagree.[8]

▆▆ "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *accord People v. Moyer*, 670 P.2d 785, 789, (Colo.1983). A provision is not unconstitutionally vague simply because it could have been drafted with greater precision. *See United States v. Powell*, 423 U.S. 87, 94, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975). No vagueness problem exists if a party strains to inject doubt as to the meaning of words where no doubt would be felt by the normal reader. *See id.* at 93, 96 S.Ct. 316; *see also Watso v. Colorado Dep't of Soc. Servs.*, 841 P.2d 299, 309 (Colo.1992) (noting that "[g]enerality is not the equivalent of vagueness" and that scientific and mathematical certainty are not required).

▆▆ A law is unconstitutional only if it "is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). Such laws are overly vague because persons of common intelligence are required to guess at the law's meaning. *See Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Delta Sales Yard v. Patten*, 892 P.2d 297, 299 (Colo.1995). Overly vague laws offend the Constitution because they fail to provide fair notice of what conduct is prohibited and they invite arbitrary and discriminatory enforcement. *See Grayned*, 408 U.S. at 108–09, 92 S.Ct. 2294; *Loonan v. Woodley*, 882 P.2d 1380, 1389 (Colo.1994).

108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Loonan v. Woodley*, 882 P.2d 1380, 1389 (Colo. 1994). In short, "an overbroad law need lack neither clarity or precision, and a vague law need not reach activity protected by the first amendment." Tribe, *supra* at 1033 (citations omitted).

Ultimately, the degree of vagueness tolerated by the Constitution depends on the nature of the enactment being challenged. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Parrish v. Lamm,* 758 P.2d 1356, 1366 (Colo.1988). When an enactment involves economic regulation or civil penalties, a less stringent vagueness test is required. *See Flipside,* 455 U.S. at 498–99, 102 S.Ct. 1186. By contrast, a stricter test applies if the law threatens to inhibit the exercise of constitutionally protected rights. *See id.* Thus, a stricter test is required when the law interferes with free speech rights protected by the First Amendment. *See id.* at 499., 102 S.Ct. 1186

Conversely, when an enactment does not burden protected speech, the Constitution tolerates a greater degree of vagueness: "Assuming the enactment implicates no constitutionally protected conduct, [a court] should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *Id.* at 495–96, 102 S.Ct. 1186. Consequently, "[a] plaintiff who engages in some conduct that is clearly proscribed by the statute cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* Therefore, in evaluating such a statute, a court should focus on the complainant's conduct before analyzing other hypothetical applications of the law. *See id.* at 495, 102 S.Ct. 1186; *see also United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) ("[V]agueness challenges to statutes which do not involve the First Amendment freedoms must be examined in the light of the facts of the case at hand."). In other words, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

As explained previously, the District's controversial materials policy does not burden constitutionally protected speech. It simply permits school officials to exercise control over the curriculum by reasonably regulating the use of nonapproved controversial materials in the classroom. As such, the policy is "reasonably related to legitimate pedagogical concerns" and is therefore wholly consistent with the First Amendment rights of Wilder and other teachers in the District. Therefore, in order for Wilder to sustain a vagueness challenge, the controversial materials policy must be impermissibly vague as applied to him. *See Flipside,* 455 U.S. at 495–96, 102 S.Ct. 1186. If the policy clearly applies to Wilder's conduct, his challenge must fail. *See Parker,* 417 U.S. at 756, 94 S.Ct. 2547.

As defined by the District, "controversial learning resources" are those "not included in the approved learning resources of the district and which are subject to disagreement as to appropriateness because they refer or relate to controversial issues or present material in a manner or context which is itself controversial." This provision clearly applies to Wilder's showing of *1900.* The film was not a learning resource approved by the District but was shown in class at Wilder's discretion. Therefore, Wilder was required to obtain approval before showing the film if it was "subject to disagreement as to appropriateness" due to controversial subject matter. Wilder had seen the film and therefore knew it contained extensive nudity, oral sex, masturbation, profanity, cocaine abuse, and graphic violence.

As a result, Wilder did not have to guess that *1900* was a "controversial learning resource." Under any rational interpretation, that category includes a film that exposes students, in a classroom setting, to a significant amount of nudity, sexual content, and graphic violence. It is difficult to imagine subject matter that, if proposed to be shown in the classroom, would create a greater "disagreement as to appropriateness." [9] Such

---

9. Wilder's own conduct shows a recognition that there was an issue as to the appropriateness of *1900.* Prior to showing the film, Wilder warned his students that it contained some "graphic realism" they might find "disturbing." He also told his students they could put their heads down or go to the library during the film if they felt "uncomfortable or embarrassed." Moreover, although Wilder did not obtain parental permission before showing *1900,* he sent home general permission slips at the beginning of the semester for his students to watch R-rated movies. Thus,

disagreement is virtually assured when the film has been flagged with an "R" rating, as is the case with *1900*.[10] Although the policy ultimately required Wilder to exercise some judgment in determining whether *1900* constituted a "controversial learning resource," it nonetheless set forth a comprehensible standard for him to follow. Hence, this is not a case in which "no standard of conduct is specified at all." *See Coates*, 402 U.S. at 614, 91 S.Ct. 1686. In these circumstances, Wilder cannot avoid the requirements of the controversial materials policy simply by claiming that in his view, *1900* was not controversial[11]. Regardless of Wilder's subjective belief regarding the need to consult with Principal Mitchell, he was bound follow the policy's notice requirements if they would be sufficiently clear to the normal teacher in Wilder's circumstances. *See Powell*, 423 U.S. at 93, 96 S.Ct. 316 ("[S]training to inject doubt as to the meaning of words where no doubt would be felt by the normal reader is not required by the 'void for vagueness' doctrine."). Principal Mitchell and both assistant principals at Columbine found 1900 to be controversial. Before the hearing officer, one teacher testified that an R-rated movie is a "red flag" that the movie is sexually explicit, violent, or filled with foul language. One of Wilder's witnesses also testified that any movie not approved by the District containing nudity and sexual conduct should be cleared with school administrators. Thus, any reasonable teacher in Wilder's position would have concluded that the District's controversial materials policy clearly applied to

*1900*. Because Wilder had fair notice that he should have obtained administrative approval prior to showing the film, he cannot complain that the policy was unconstitutionally vague. *See Flipside*, 455 U.S. at 495–96, 102 S.Ct. 1186 (noting that under the less strict vagueness test, a law must be "impermissibly vague in all of its applications").

## V.

■ Finally, Wilder contends that his due process rights were violated because the District failed to provide him with notice of the existence of its controversial materials policy. Again, we disagree.

■ Due process principles are satisfied as long as the notice is reasonably calculated to reach the intended party. *See Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 318, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *People v. Lessar*, 629 P.2d 577, 581 n. 3 (Colo.1981). It is well established that when statutory requirements are at issue, parties receive adequate notice through publication. *See North Laramie Land Co. v. Hoffman*, 268 U.S. 276, 283, 45 S.Ct. 491, 69 L.Ed. 953 (1925); *People v. McKnight*, 200 Colo. 486, 497, 617 P.2d 1178, 1186 (1980) ("The requirements of due process are satisfied by the notice which is given through publication of the statutes."). Similarly, insofar as published policies and regulations are concerned, teachers are presumed to know the standards that govern their conduct. *See Blaine v. Moffat County Sch. Dist. RE No. 1*, 748 P.2d 1280, 1293–94 (Colo.1988).

---

Wilder recognized that parents might object to the appropriateness of R-rated films such as *1900*.

**10.** By itself, the R-rating provided Wilder with notice that *1900* constituted a "controversial learning resource." When another teacher proposed that students see *Schindler's List*, also an R-rated film, Columbine's administration called a faculty-wide staff meeting due to the film's controversial nature. That meeting was attended by Wilder. Therefore, Wilder was on notice that showing an R-rated film, even a highly acclaimed one, would cause a "disagreement as to appropriateness."

Moreover, the fact that most of Wilder's students were old enough to view an R-rated film in a public theater does not mean that *1900* was appropriate for use in the classroom. As the hearing officer noted, there is a difference be-

tween viewing controversial material "outside the school and showing an R-rated film in class at school."

Although the record indicates that Wilder showed an R-rated film on another occasion, it is unclear whether he did so with prior approval from administrators. The hearing officer explained that there was "insufficient evidence to determine whether Mr. Wilder's actions in showing the [other] movie were improper."

**11.** Wilder testified that he did not find *1900* controversial. However, the hearing officer never found whether the film was in fact a "controversial learning resource." Instead, she simply stated that "[t]he Hearing Officer cannot determine whether *1900* did or did not meet community standards."

Wilder is not entitled to actual notice of the District's policy; he is entitled to reasonable notice, which may be accomplished through publication. According to testimony before the hearing officer, the controversial materials policy has been published by the District and filed in the library of each school. Nothing in the record indicates that Wilder was deprived of the opportunity to review the policy in the library at Columbine High School. Furthermore, the hearing officer found that Wilder knew controversial materials should be cleared with the principal prior to use in the classroom. In these circumstances, Wilder clearly had reasonable notice of the District's policy, sufficient to satisfy the principles of due process.[12]

## VI.

As noted in the Board's Resolution and Order of Dismissal, "Wilder's decision to show his class a film containing scenes of nudity, sexual content, drug use, and violence, without notifying administrators, parents, or students of his intentions circumvented the procedure established by this board to ensure the use of appropriate learning resources." Concluding that such behavior constituted neglect of duty, the Board ordered that Wilder be dismissed pursuant to section 22–63–301. Contrary to Wilder's arguments, the Board did not violate his rights of free speech and due process guaranteed by the Constitution; it simply insisted that Wilder follow an established procedure permitting publicly accountable school officials, and not individual teachers, to exercise final authority over the curriculum being presented in the classrooms of Columbine High School. Because these actions were not arbitrary, capricious, or otherwise legally impermissible, we reverse the court of appeals and remand with instructions to reinstate the Board's Resolution and Order of Dismissal.

HOBBS, J., dissents, and MARTINEZ and BENDER, JJ., join in the dissent.

12. Because Wilder received adequate notice of the District's official policy, we do not address the court of appeals' analysis of whether section 22–63–302(8) requires that a teacher's dismissal

Justice HOBBS, dissenting.

I respectfully dissent. I agree with the court of appeals that Wilder's dismissal by the Jefferson County School Board (Board) was arbitrary, capricious, and legally impermissible. In his professional judgment, Wilder determined that showing the film *1900* to his logic and debate class of seventeen- and eighteen-year-old young adults would be appropriate and not controversial. Given the vagueness of Board policies INB and INB–R (policies), it is not possible to determine whether his conduct was prohibited by them.

I would hold that the portion of the policies relating to "controversial learning resources" and "controversial issues," insofar as they subject a teacher to discipline for an alleged violation, are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment. The policies are standardless and require teachers to guess what the Board might later consider to be "controversial."

The majority characterizes *1900* as containing "a significant amount of nudity, sexual content, and graphic violence," and concludes that it is self-evident that an "R" rated film offends the policies. Maj. op. at 704. I read the hearing officer's findings, the record of this case, and the applicable law differently. A teacher with twenty-five years of service in Jefferson County, Wilder was unjustly fired and should be reinstated.

## I.

*The Facts of This Case*

A.

*1900*

*1900* is a 255 minute film, directed by Bernardo Bertolucci, depicting events in Italy between 1900 and 1945, perhaps the most violent and transforming half-century in human history. Persons living in western mainland Europe during this period personally experienced two world wars, socialism, fascism, communism, and the liberation of

be based only on the reasons set forth in the superintendent's recommendation of dismissal. *See Wilder*, 944 P.2d at 603–04.

their countries from dictatorship. Bertolucci's film shows families and family members, rich and poor, and how they endured or disintegrated during this time.

The film is generational, epic, artful. Born on the same day in 1900 on the same estate, two boys, one rich—the landowner's grandson (played by Robert DeNiro)—and one poor—a peasant's grandson (played by Gerard Depardieu)—grow up and grow old together. Though they are natural adversaries by economic and social class, they become lifelong friends.

The movie begins with the old padroni/grandfather (played by Burt Lancaster) celebrating his grandson's (DeNiro's) birth by taking bottles of wine into the field to share with the peasant workers, one of whom is his lifelong friend and also the grandfather of the other boy (Depardieu). The film ends in 1945, upon the liberation of Italy, with the trial of a citizens' court wherein Depardieu's peasant character spares the life of DeNiro's landed character.

In between occurs the rise, cruelty, and fall of fascism portrayed through the character of the estate's foreman (played by Donald Sutherland). As the film progresses, he kills a cat and then proceeds to kill humans for personal and political purposes.

The peasant workers liberate the estate they have labored on their whole lives, as the country is simultaneously being liberated by the allies from the fascists. Sutherland's black-shirted character confesses, as long suspected by the peasants, to murdering two persons, a boy who has taken the fascist's black gloves to try them on, and a widow whose villa the fascist and his lover covet. Having manipulated these murders to gain power and property for himself, and having falsely accused others, the fascist is executed by a peoples' court at the foot of his victims' gravestones while an accordion plays and the people dance.

DeNiro's character is tried by the peoples' court and found guilty of being the padroni, the padroni's son, and the padroni's grandson. An act of grace spares him. Depardieu's character declares that the padroni is forever dead but the person of this last padroni must live, so to constantly remind the people of their victory.

Having been spared, instead of thanking Depardieu, DeNiro declares to his face that the padroni is not dead. The two of them fall immediately to wrestling as they have done, in sport and in conflict, throughout their lives. In the last scene of the film, old with age, they wrestle on a country path with slices of their youth and old age flashing against the rural landscape they treasure.

The film contains brief scenes showing nude persons or suggesting that acts of sex are occurring or have occurred. However, these scenes universally occur in the context of a much longer narrative and are markers of passing moments in the protagonists' lives. They are not shown in shocking or erotic detail. For example, the two pubescent boys are shown fully clothed doing push-ups on the ground, suggesting experimentation with masturbation. They are not shown masturbating. When they briefly expose themselves to each other in a separate scene they are commenting evidently on the fact that one is circumcised and one is not.

When they are young adults, the DeNiro and Depardieu characters get into bed with a woman DeNiro has paid. This scene is shot from the foot of the bed and does not show any sex act. The woman is forced to have an alcoholic drink and goes into an epileptic fit. Her fit drowns out any notion of eroticism, and the entire scene functions to show the corruption of a rich man's power over a young peasant woman. The drug use scene is brief, and again is evidently utilized to show the corruption of money in an urban setting apart from the values of a farming community. This scene does not glorify the use of drugs.

The scene of the fascist played by Donald Sutherland killing the cat with his head shows blood on his head but not the agony of the cat. This scene is later paralleled by the fascist killing the boy who is eavesdropping on the fascist and his lover. The fascist swings the boy by his feet in the air so that his head hits the wall, killing him. The boy's death is not shown in gory or agonizing detail. Nonetheless, this scene convincingly portrays the cruelty of fascism.

Contrary to the Board's and the majority's portrayal, *1900* is not a patently offensive movie. It deals with the fascist counterpart to Nazism in the same era as *Schindler's List.* Wilder's students were unable to see the whole of the film and debate its viewpoints because the principal confiscated it upon the complaint of a parent.

## B.

### 1995

Wilder, who first began his teaching career in Jefferson County in 1970, was an innovative teacher known for helping students develop their critical thinking skills and utilizing a wide variety of instructional aids. A faculty evaluation during his third year at Columbine High School describes him as follows:

I am convinced that he is a uniquely talented and diverse educator. He is a warm, sensitive teacher who is extremely supportive of his students. He has a special skill in prompting students to participate in classroom discussions without fear of judgment and ridicule from their peers. His classroom techniques are many and diverse. He is a skilled educator who is constantly challenging his students to develop their critical thinking skills. He uses a wide variety of techniques to foster student participation in class. He is constantly making the subject matter relevant to today's society. He uses the chalkboard, audio-visual materials, class hand-outs and student presentation frequently. His ever changing classroom technique keeps students involved and interested to the point where there weren't any visible discipline problems.

Evaluations throughout his career up to his termination contained similar comments. However, at times he was late to his classroom or excused himself from the classroom to use the phone while students were doing assignments. He explained that these instances were due to having to pay attention to problems at home stemming from illnesses of both his daughters and from his wife's resulting emotional fragility. Wilder's evaluations at times caution him to improve his classroom attendance, and he was admonished for allowing students to have food in the classroom; but he was not required to pursue a remediation plan, nor was he administered any other form of discipline during his long tenure with the school district. Students praised his teaching and his concern for them. They also testified that other teachers had been late to class or had excused themselves while class was in session, and they did not notice or think that Wilder was inordinately absent.

The school district fired Wilder after he showed *1900* to his senior year logic and debate class in March of 1995. *1900* has an "R" rating. Newspaper advertisements for films rated "R" shown in the communities of the school district bear the following advisory in capital letters: RESTRICTED, UNDER 17 REQUIRES ACCOMPANYING PARENT OR ADULT GUARDIAN. Wilder's students were all either seventeen or eighteen years of age. *1900* is available for rent in the "drama" section of Denver metropolitan area video stores.

Wilder and many other teachers had been using films as instructional aids in their classes at Columbine. Because the school district had only a handful of films listed as an official part of the curriculum, and the list had not been updated since the mid-to-late 1980s, the teachers individually selected those films which they believed would forward the content of their courses in accordance with the school district's curriculum. Some of those films were "R" rated. Some teachers used parental permission slips in connection with using such films in the classroom, others did not. Only one teacher had cleared an "R" rated movie by prior written notice to the principal, *Schindler's List.* In that case, parental permission was particularly needed because the students had to travel to a local theater to see the movie.

Neither the school district's written policy, nor Columbine's informal policy, contained a specific requirement that "R" rated films be reviewed with the principal prior to their use. Rather, these policies addressed the use of "controversial learning resources."

The school district's written policy INB stated that:

Controversial issues include matters characterized by significant differences of opinion usually generated from differing underlying values, beliefs and interests, which produce significant social tension and which are not necessarily resolvable by reference to accepted facts. Matters usually become controversial not so much due to disagreement about facts, but as to the interpretation or values to be applied to facts.

Policies INB and INB–R (INB's procedural counterpart) turned upon the responsibility of the classroom teacher to decide in the first instance whether the material he or she intends to use is a controversial learning resource. In the teacher's doing so, policy INB stated that:

Due consideration must be given to the maturity and ability of the students, standards of the community and sound professional judgment.

The school district's policies were not included in teacher handbooks at Columbine. The school's principal testified that he had not talked in any faculty meeting about the policies and had not sent any written statements of policy or memoranda to the teachers regarding them:

Q. You also didn't talk about policy INB in any faculty meetings prior to March of 1995, correct?

A. I don't think we talked—we have talked specifically about the policy, no.

Q. You haven't sent any notices to the teachers in the five years that you've been at Columbine telling them what you expect if they are going to use a controversial material, correct?

A. No.

Q. ... My question is this: Is there any written policy in the school district that requires a teacher to get permission slips if they're going to show a movie?

A. No.

Q. ... You didn't send out any written notices to the teachers saying that if you're going to use an R-rated movie, you send out permission slips first?

A. No.

Despite the fact that policies INB and INB–R were not contained in faculty materials, they were filed in Columbine's library. Columbine's principal testified that there existed an unwritten policy at the school which the teachers understood. They were to clear controversial learning resources with him. These policies rested, in the first instance, on teachers determining in their professional judgment whether the learning resource was controversial, so as to require clearance from him:

Q. A teacher does not have to get permission to use a controversial—well, a teacher does not have to get permission from you to use a resource if they don't believe it's controversial?

A. I think that's true in the sense that teachers use resources that they select all the time.

Columbine's principal knew that Wilder had regularly used films in his classes and had not objected to Wilder's use of them; in addition, no administrator during Wilder's twenty-plus year record of service with the school district had objected to Wilder's choice of resources [1]:

Q. ... My question is: Prior to Mr. Wilder showing the movie "1900" in March of '95, you never objected to any of the movies he showed in his class?

A. I don't believe I did, no....

Q. In the 20–year–plus history of Mr. Wilder's career in Jefferson County, no administrator has objected at least in writing to his use of materials in the classroom, to your knowledge?

A. To the best of my knowledge, there is nothing in Mr. Wilder's file that communicates an objection by an administrator.

Wilder's normal practice was to circulate a general parental permission slip to his students at the beginning of the school year; these included an advisory that "R" rated films might be shown in the class. Many of

1. The record notes that Wilder had previously shown "R" rated films without objection from school officials, but those films were not identified by name. Other teachers had shown "R" rated films, such as *The Browning Version,* and excerpts of *Monty Python* and *Platoon.*

the students in his logic and debate classes had taken other classes from him wherein films had been shown without pre-clearance and without objection by the administration.

Before showing *1900* to his students, Wilder previewed the opening fifteen to twenty minutes of it with the class, and asked them whether they wanted to proceed with viewing the movie. The class decided in favor of this. Wilder had chosen the film because, in the preceding weeks, he and the students had shifted from "early Greek ideas, Aristotle, Plato" to the 20th century: "I decided to focus on a half-dozen key ideas. And those key ideas were socialism, fascism, democracy, feudalism, and something about individual freedom. . . ." He did not consider these themes or the film to be controversial:

Q. Do you consider the film "1900" controversial?

A. No, I do not.

Q. Did you at the time consider it controversial?

A. No, I did not.

Nevertheless, before showing the fifteen to twenty minute preview, Wilder explained and cautioned the students that the film contained graphic realism at times. On the second day, one of the students asked whether they should be seeing this film. Wilder said that anyone who was disturbed could put his or her head down during the particular scene or be excused to do an alternate assignment in the library. After three to five days of showing and discussing the film in class, one of the students spoke about several of the scenes with a parent. The parent called the principal. The principal confiscated the film. He watched it by fast-forwarding to certain scenes. Upon viewing scenes he thought might be considered "controversial," he forbade the class from continuing to view and discuss it, suspended Wilder, replaced him with a substitute teacher, and prepared—for disciplinary purposes—a twenty minute edited version of "controversial" scenes from the 255 minute film. Wilder's termination followed a grievance which he filed for being placed on administrative leave.

Columbine's principal asked the students of the logic and debate class to complete a written questionnaire concerning the film; the overwhelming majority considered it to be appropriate. Only two objected. Several students testified regarding their belief that the film was appropriate, for example:

Q. Did you have an opinion about whether the movie was appropriate to what you were discussing?

A. Yes, I believe it was very appropriate to what we were discussing.

Q. Why do you believe that?

A. Well, since we were discussing socialism and fascism, the movie was pertinent to what we were discussing. It was illustrating all the aspects of that, and what went on during that time. . . .

Q. Did you see—was there anything in the movie that offended you?

A. No.

Q. Why? That might not be a very good question, but why do you feel that there was nothing offensive in the movie?

A. I can see the same kind of things on TV, prime time television. I'm—I was 17. I'm 18 now. I can go to the movie theater and see the same—the same thing.

Film critic and teacher Howie Movshovitz of the Denver Post and KCFR Public Radio testified that the twenty minute version of the film prepared by the principal did not fairly present the film. Movshovitz stated that scenes alleged to be offensive, taken in context, were not titillating but were utilized to illustrate the themes of class differences and morality, people going too far: "[I]t's not about sex. It's about corruption, I think, personal corruption."

Dr. Kearns, a professor of English at the University of Northern Colorado, testified as an expert witness that the movie was appropriate for seventeen- and eighteen-year-old persons to watch in a course on debate, since the very nature of a debate class is to look at various viewpoints. In his opinion, the film was not controversial when shown in the context of this course and age group, was appropriate for its intended purpose, met the school district's general curriculum guide-

lines, and was not offensive to community standards. He testified, in part, as follows:

Q: Do you have an opinion as to whether or not the showing of "1900" and also—by the way, can you give us the grounds and tell us why it should be shown and it was not objectionable and not controversial to show it to a 17– and 18–year–old group? You said it is not. Tell us why you feel that way.

A: Well, to begin with, the District policy that I read does not define controversy in itself. Certainly the film that I saw, it included very brief scenes of nudity; certainly it had political content; it had a violent content. But totally outside of the context within which it was taught, if I had looked at that film strictly in and of itself, I would not have regarded that as in any way objectionable or controversial. I wouldn't have hesitated to use it in my own class and in a classroom of a 17– and 18–year–olds.

In the context of the District policy that I read, there was no definition of what constitutes controversial material. There was a reference to maturity level of students. And I would certainly regard 17– and 18–year–olds as mature enough to see that particular film.

And finally, there was a reference, as I recall, to community standards or respect for community standards, which I feel that I have. And certainly in all of those cases there were no clear definitions. I felt that that film would not violate a community standard of value and, therefore, on that basis I reached my opinion not simply in the abstract of judging the film but also in the context of the particular course in the District.

Further, in looking closely at the film, I noticed the particular ways in which Bertolucci directed some of the scenes that apparently have come [under some] question. And his film techniques clearly minimize the prurient dimension, if that's what's in question, using care in the distance of the camera from the subject matter, using lighting and shadowing, and especially using dialogue that works through some of those scenes and maintains attention, the audience's attention on the political controversy or the kinds of arguments that the film involves.

So from those multiple perspectives, and I think that the last one is particularly important, I reached the conclusion that that film would be appropriate to a 17– or 18–year–old audience, certainly in this community, elsewhere throughout the state.

A Fort Collins high school English teacher who had the same age group of students agreed.

### C.

### *The Hearing Officer's Findings*

The hearing officer determined that dismissal was not warranted, that although Wilder was tardy and absent from class and the principal had warned him to correct this conduct, he had shown improvement in his punctuality and class attendance, and that the policy regarding controversial learning resources was unduly vague.

The hearing officer found that the dismissal proceedings would not have been instituted were it not for Wilder showing *1900:*

The School District seeks dismissal of Mr. Wilder after he showed *1900.* The Hearing Officer finds that showing the *1900* was "the straw that broke the camel's back" and but for this action, no dismissal proceedings would have been instituted. Therefore, the Hearing Officer must determine whether Mr. Wilder's actions in showing the film was insubordination, neglect of duty or other and just cause.

The hearing officer found in favor of the opinions of the experts who testified as to the educational value and appropriateness of the film:

The evidence is undisputed that *1900* has literary and artistic value. The experts and Mr. Bertolucci[2] testified in great detail about the literary, political and artistic aspects, and what the movie is trying to portray. Mr. Wangswick, who teaches high school English in Fort Collins, testi-

---

**2.** Bernardo Bertolucci testified at the hearing by telephone from Italy.

fied he would not have a problem showing *1900* to seniors in high school. Dr. Kearns, a professor of English ... also opined that he believed the movie was appropriate for 17 to 18 year olds to watch in a course on debate since the very nature of a debate class is to look at different viewpoints. In his opinion, the film is not controversial, is appropriate for its intended purpose and met the School District's general curriculum guidelines.

The hearing officer found that the movie *1900* was appropriate and relevant to the school's curriculum for Wilder's logic and debate class:

> The Hearing Officer finds that *1900* as a learning resource was relevant to the curriculum objectives of Mr. Wilder's course and that it was useful in contributing to the attainment of the educational objectives. The Hearing Officer also finds that the themes presented in *1900* were useful in trying to teach students to think critically and act responsibly toward others and students had the ability and maturity to understand the purpose of the movie.

The hearing officer found that Wilder himself had determined the film to be useful and appropriate for his logic and debate class:

> He believed the movie was a great masterpiece for neo-realism.... Since Mr. Wilder liked to teach literature in historical context, he thought *1900* was a good introduction to the twentieth century and the role of the individual in society.

The hearing officer further found that teachers at Columbine had different perceptions about what type of material was "controversial":

> The teachers had different definitions for controversial material. Some testified that the material had to be provocative, contain extreme language, extreme violence or be sexual in nature. One teacher testified that if the film is rated "R" it might be considered controversial but one had to use her professional judgment. Ms. Samson testified she does not use controversial materials even though the movie *The Browning Version* which is rated "R" was shown to her class and some of the plays

the students attended contained sexual scenes.

The hearing officer determined that neither the school board's written policy, nor the school's unwritten policy gave fair warning that a film such as *1900* is a "controversial learning resource":

> Since a teacher must only seek review of controversial material with the principal, it can only be a violation of the policy if the material is in fact controversial. The Hearing Officer agrees with the teacher that neither the unwritten policy nor Policy INB gives fair warning to Mr. Wilder that a film such as *1900* is a controversial learning resource. The Hearing Officer finds that persons of ordinary intelligence must guess at the meaning of a "controversial learning resource." Accordingly, the Hearing Officer finds that because the policies are vague, Mr. Wilder cannot be disciplined for making a professional judgment that *1900* was an appropriate teaching material for his Logic and Debate class.

The Board accepted the hearing officer's findings of fact but nevertheless terminated Wilder, citing "erratic arrival at school; failure to appear for an administrative staffing; failure to report or reporting late to assigned duty; failure to complete paperwork on time; late arrival for his supervision duty, and missed parent/teacher conferences." The Board also cited "neglect of duty" in failing to advise the principal of his decision to show *1900* as a reason for termination. The Board determined that the controversial learning resources policy was not unduly vague and that "any 'R' rated film containing scenes of nudity, sexual conduct, drug use, and violence falls well within the scope of the policy."

The court of appeals ruled that Wilder did not have prior notice of the policy and regulation concerning controversial learning resources. We granted certiorari on three issues, including whether the policy was vague. I agree with the hearing officer and the court of appeals that Wilder did not receive due process of law.

## II.

### The Law of This Case

I would hold that the hearing officer was correct in concluding that Wilder should not have been fired. Given the vagueness of the policies, *see* discussion *infra* Part II.B., his actions were not inconsistent with their requirements. He showed the film after exercising his sound professional judgment that the film was not controversial in light of the curriculum content of his course and the maturity of the students. The policies failed to give adequate notice that Wilder's use of *1900* in the logic and debate class to students of seventeen and eighteen years of age was grounds for immediate termination.

### A.

### Compliance With the Policies

School board policy INB–R provides:

The teaching of controversial issues and the selection and use of controversial learning resources requires the recognition of responsibilities by the teacher to students, by the principal to the school and by the school to the community.

The "Guidelines for teachers" to implement this policy are set out as follows:

**Guidelines for teachers**

The teacher will adhere to the following guidelines:

1. Teaching about controversial issues and use of controversial learning resources are permitted in accordance with this regulation as long as the issue or resource is relevant to the curriculum objectives of the course.

2. Issues and learning resources selected for discussion and study must be appropriate for instructional use and contribute to the attainment of the educational objectives of the course.

3. Teachers will follow the approved district curriculum subject matter. All course content and activities must be consistent with stated course objectives.

4. The issues and learning resources should be within the level of the student's ability and maturity and consistent with community standards.

5. In teaching about controversial issues or using controversial learning resources, developing the students' skills of critical thinking and problem-solving and understanding of the democratic process will be the principle [sic] goals.

6. Teaching strategies should be fairly employed so that all sides of the issues are explored.

7. Suitable materials including facts and concepts relating to all aspects of the issue should be available.

8. The principal must be informed in writing of all planned teaching of controversial issues or use of controversial learning resources as soon as reasonably possible and, in any case, not less than 20 working days in advance of their presentation to students. Such notification must include an identification of the controversial issue or resource, a description of the proposal and a statement of the educational purpose of the proposal.

Contrary to the findings of the hearing officer, the Board found that Wilder did not show the film *1900* "in accordance with the standards and procedures established by school district policy and regulation." Because Wilder's actions were not inconsistent with the Board's policies, I disagree with the Board's finding.

In ordering the dismissal of a teacher, pursuant to sections 22–63–101 to –403, 7 C.R.S. (1997), a school board is bound by the hearing officer's findings of evidentiary fact if those findings are adequately supported by the record. *See Board of Educ. of West Yuma v. Flaming*, 938 P.2d 151, 157 (Colo. 1997). In reviewing the termination of a teacher, a reviewing court is likewise bound by the hearing officer's findings of fact so long as they are supported by the record. *See Adams County Sch. Dist. No. 50 v. Heimer*, 919 P.2d 786, 791 (Colo.1996). One of the hearing officer's key functions in fact-finding is to review the evidence and testimony and make determinations as to the credibility of witnesses. *See Blaine v. Moffat County Sch. Dist. RE No. 1*, 748 P.2d 1280, 1286–87 (Colo.1988).

The Board in this case, although it rejected the hearing officer's recommendation for retention, accepted the hearing officer's findings of fact in its Resolution and Order of Dismissal. I agree with the Board that the hearing officer's findings are supported by the record.

However, in my view, given that the standards imposed by the regulations are so opaque as to be unknowable with reasonable certainty, the Board erred in determining that Wilder had failed to follow Board regulations INB and INB–R. The hearing officer found that (1) the film *1900* was suitable for the curriculum and appropriate for the maturity level of his class, and (2) Wilder, in his professional judgment, believed the film was appropriate in light of the standards of the community and not "controversial."

Policy INB provides that the classroom teacher decides whether the learning resource requires clearance with the principal:

Due consideration must be given to the maturity and ability of the students, standards of the community, and sound professional judgment.

It is unclear precisely for what purpose criteria 1 to 8 in policy INB–R are to be applied, and by whom. Thus, the relative importance of the teacher's decision regarding the level of "controversy" surrounding a learning resource is unclear, rendering the policies' requirements even more indeterminate. The steps embodied in criteria 1 to 8 may be intended to guide the teacher in determining whether written notice to the principal is to be given, as well as serving as a guide to teaching about "controversial and sensitive issues."

The hearing officer's findings are supported by evidence in the record demonstrating that the film met criteria 1 to 7 of Board policy INB–R. The hearing officer agreed with Dr. Kearns that *1900* has "literary and artistic value" and was "appropriate for 17 and 18 year olds to watch in a course on debate since the very nature of a debate class is to look at different viewpoints." The showing of the film accorded with the district's policy as follows: it: (1) met the curriculum objectives (criterion 1), (2) was appropriate for instructional use (criterion 2),

(3) was consistent with course objectives (criterion 3), (4) was within the level of the student's ability and maturity (criterion 4), (5) supported development of critical thinking and problem-solving and understanding of the democratic process (criterion 5), (6) was fairly employed (criterion 6), and (7) included facts and concepts relating to all aspects of the issue being taught (criterion 7).

Because Wilder, in his professional judgment, did not deem the resource to be a "controversial learning resource" as utilized in the curriculum for his class, the proper application of criterion 8, clearance of the resource through the principal, is uncertain. The policies do not explain whether clearance of the resource is necessary when the teacher has determined that the resource is not "controversial." The problem with this indefinite policy is underscored in a scenario, like this one, where the teacher's decision appears proper. Wilder's exercise of professional judgment in this regard was shared by educators and film experts whose testimony the hearing officer accepted and believed.

Wilder was teaching high school logic and debate. Logic and debate require controversy; in the absence thereof, debate is impossible. The curriculum anticipated that the teacher of this particular course would necessarily engage in presenting "controversial" subject matter. One definition of "debate" in Webster's Dictionary is "controversy." *Webster's Third New International Dictionary* 582 (1961) (meaning 2a). Taken at its plain meaning, policy INB's reference to "controversial learning resources" and "controversial issues" becomes almost nonsensical when applied to Wilder's class. Wilder's job assignment was to spark debate and lead his students along the path of critical thinking. He was not required to clear each and every "controversy" he intended to use.

The school had approved *Schindler's List* in connection with an off-campus viewing of that film; Wilder had reason to believe, in comparing the two, that showing *1900* would not be "controversial." With regard to community standards, all students in the class were at least seventeen, old enough to watch

the movie by renting it from a video store or watching it in a theater without parental permission. Most, if not all, of the logic and debate students were about to graduate and enter into the adult world, a particularly appropriate time to view such a film that focuses on the rites of passage of two boys during a turbulent period in history when the democratic countries were struggling against the fascist and Nazi regimes for their survival. Grandparents of Wilder's students were involved in this worldwide struggle.

The hearing officer believed Wilder when he stated that the film was appropriate, not "controversial," given the context of his job assignment and the class he was teaching. This is not a case in which the teacher knew a film was inappropriate but showed it anyway in an attempt to defy school authority. Rather, the teacher here made a reasonable attempt to follow the curriculum, and exercised reasoned judgment in accordance with the policies, in utilizing the film. He previewed and discussed the film with the students before proceeding. After it was shown, all but two of the students agreed that the film was appropriate. Short of sending all resources to the principal that are not on a specified list—a policy not in effect in Jefferson County—a teacher must exercise reasoned judgment under the existing policies in determining whether a resource is a "controversial learning resource" for his or her class.

The policies did not prohibit the showing of "R" rated films, so long as they were utilized in pursuit of the curriculum, nor did the policies specify that use of "R" rated films required clearance by the principal. The majority, like the Board, in finding that criterion 8 of INB–R had been violated ("controversial learning resource" requires twenty days advance notice in writing to the principal), ignores the hearing officer's pertinent findings of fact that the film met the curriculum objectives and was suitable for the age and maturity of the class.

Nevertheless, the Board terminated Wilder, relying tautologically on the existence of a "controversy" to demonstrate that the film was a "controversial learning resource." As discussed above, it appears that Wilder may have actually complied with the requirements of the policies. However, the obscurity of the policies' standards makes a definitive answer to this question impossible. Therefore I turn to the question of whether this obscurity renders the policies so vague as to prevent their use in justification of firing Wilder.

### B.

#### Vagueness of the Policies

A regulation whose terms are unduly vague violates the Due Process Clause of the Fourteenth Amendment. *See Parrish v. Lamm*, 758 P.2d 1356, 1367 (Colo.1988). We have previously described the void-for-vagueness test as follows:

> A statute offends due process of law ... if it is so vague that it does not provide fair warning of the conduct prohibited or if its standards are so ill-defined as to create a danger of arbitrary and capricious enforcement.... A statute is not void for vagueness if it fairly describes the conduct forbidden, and persons of common intelligence can readily understand its meaning and application.... The vagueness test "is not an exercise in semantics to emasculate legislation; rather, it is a pragmatic test to ensure fairness."

*Id.* at 1367–68 (citations omitted). The hallmark of a vague law is its impermissible delegation of authority under circumstances inviting arbitrary enforcement:

> A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

To be void for vagueness, generally the law or regulation must be impermissibly vague in all of its applications. *See Lamm*, 758 P.2d at 1367. In some circumstances, however, courts have concluded that a person need demonstrate only vagueness as applied. *See Smith v. Goguen*, 415 U.S. 566, 578, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) ("The language at issue is void for vagueness as ap-

plied...."); *Adams v. Gunnell*, 729 F.2d 362, 369 (5th Cir.1984) ("Instead, we must consider whether the catch-all rule is impermissibly vague as applied to the conduct of these plaintiffs—that is, whether they had fair warning that their conduct was proscribed.") In *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), the Supreme Court required that a person demonstrate that the regulation was vague as applied to him or her. As explained below, the Board's policies are vague as applied to Wilder's conduct; thus, they cannot be utilized to fire him.

I would hold that the operative terms "controversial learning resources" and "controversial issues" are so vague that an ordinary person must guess as to their meaning, making the danger of arbitrary and capricious enforcement exceedingly high. Policy INB defines a "controversial learning resource" as "subject to disagreement" and defines a "controversial issue" as "characterized by significant differences of opinion usually generated from differing underlying values, beliefs and interests." The policy gives no indication of whose yardstick measures "controversial."

The public schools teach children from a diversity of families and backgrounds, many of whom undoubtedly have "differing underlying values, beliefs and interests." The Board's view of its policy forces the teacher to guess at what might fall within this policy. Potentially every novel taught in English class, potentially every picture, film, or book taught in a world history class, and potentially every matter raised in a course on logic and debate could be "controversial" in the sense of being "subject to disagreement" or "characterized by significant differences of opinion." That is what makes them worth teaching.

A teacher who is charged with selecting resources for a class has no way of knowing what matters fall within the policies. He or she must (1) give the principal a twenty day written notice of any matter that is not specifically listed as part of the curriculum, or (2) proceed without notice to the principal and take the risk that someone in the school community might think the matter "controversial," or (3) simply decide to refrain from teaching anything with which some person might have a problem.

The regulation is essentially standardless as it presently exists. The policies do not clearly explain the forbidden conduct because whether the conduct is forbidden turns on whether some member of the community, or the principal, and, ultimately the school board after the "controversy" begins, might find it "subject to disagreement."[3] The evidence shows that the teachers at Columbine themselves did not know how to interpret the policies. Indeed, the hearing officer found that teachers differed in their interpretations of the meaning of "controversial" as the regulation uses that term. One teacher thought material had to be "provocative, contain extreme language, extreme violence, or be sexual in nature," another thought an "R" rated movie "might" be "controversial," and another testified she did not use "controversial" materials even though she showed an "R" rated movie and took students to plays with scenes portraying sexual themes. To compound the problem, according to the hearing officer, most teachers did not even know the policies existed: "Most teachers at Columbine were not aware of Policy INB or the need to give 20 days written notice if the teacher wanted to use a controversial material."

The vagueness of this policy invites arbitrary and capricious enforcement. As the Supreme Court observed in the flag contempt case, "What is contemptuous to one man may be a work of art to another." *See Goguen*, 415 U.S. at 573, 94 S.Ct. 1242. In this case, Wilder made a reasoned judgment supported by facts, backed by experts, that *1900* was appropriate for the students in his course. The hearing officer so found:

[N]either the unwritten policy nor Policy INB provides sufficient guidance in determining whether the movie was controversial. In Mr. Wilder's professional judg-

---

**3.** The principal of Columbine conceded in his testimony that "I do not require 20 days' written notice unless there's *going to be a disagreement* about whether or not a material can be used." (Emphasis added.)

ment the movie was not controversial and appropriate to the educational goals of the course and the student's level and ability. Furthermore, Mr. Wilder's failure to comply with the twenty day advance notice requirement of INB–R was not improper under these circumstances.

Art inspires thought by rooting in the heart the image of justice versus injustice. Bertolucci's film inspires and instructs. To the extent that community standards are a benchmark of the policies' implementation, this film was not offensive to community standards. The "R" rating is utilized throughout America as a theater, video store, and newspaper-published guideline for whether a particular age group may view a film without an accompanying parent. The Board did not proscribe "R" rated movies or require their clearance *per se,* letting stand the movie rating guide as a community standards indicator. The principal and the Board based their termination of Wilder on a twenty minute film which the principal had assembled, not Bernardo Bertolucci's film.

Were one to underscore the socially instructive highlights of Bertolucci's film, the twenty minute excerpt instead could have included scenes showing the women of the village standing up against fascist soldiers, the act of grace in sparing a friend's life despite political advantage to be gained in killing him, and the joy that rich and poor people alike take in living despite evils which exist in society.

This nation was founded on disagreement and born of a diversity of ideas, peoples, and religions. Our public schools, at their best, generate interest and excitement in learning, instill democratic values, and prepare today's youth to become thinkers and problem-solvers. "The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, rather than through any kind of authoritative selection.'" *State Bd. for Community Colleges v. Olson,* 687 P.2d 429, 437 (Colo.1984) (quoting *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)) (citations omitted).

When we strip teachers of their professional judgment, we forfeit the educational vitality we prize. When we quell controversy for the sake of congeniality, we deprive democracy of its mentors. The students of Wilder's class learned a valuable lesson at the expense of their teacher's job: one person's expression of ideas in the interest of critical thought and learning may be another person's "controversy."

I would uphold the judgment of the court of appeals for Wilder's reinstatement. Given the vagueness of the Board's policies, it is not possible to determine whether his conduct was prohibited by them. The Board's obscure policies did not provide fair warning that the film *1900* was "controversial" and required clearance from the principal before being shown to students. The policies are vague as applied to Wilder's actions and cannot be a basis for his termination.

I am authorized to say that Justice MARTINEZ and Justice BENDER join in this dissent.